# IN THE COURT OF APPEALS OF TENNESSEE
# MIDDLE SECTION AT NASHVILLE

**FILED**

March 27, 1997

Cecil W. Crowson
Appellate Court Clerk

GINGER DIANNE GRIGGS TURNER, )
                                    )

     Plaintiff/Appellee, )   Davidson Circuit
                                    )   No. 91D-1377

VS.                           )

                                    )   Appeal No.
                                    )   01A01-9506-CV-00255

ROBERT PHILLIPS TURNER, JR., )

                                    )

     Defendant/Appellant. )

## APPEAL FROM THE CIRCUIT COURT FOR DAVIDSON COUNTY
## AT NASHVILLE, TENNESSEE

## THE HONORABLE MARIETTA M. SHIPLEY, JUDGE

For the Plaintiff/Appellee:

Kathryn G. Brinton
Nashville, Tennessee

Philip E. Smith
Nashville, Tennessee

For the Defendant/Appellant:

David S. Zinn
Michael D. Dillon
ZINN AND ASSOCIATES
Nashville, Tennessee

# AFFIRMED AS MODIFIED
# AND REMANDED

WILLIAM C. KOCH, JR., JUDGE

# **O P I N I O N**

This appeal involves the dissolution of an eleven-year marriage. The wife first filed a complaint for separate maintenance in the Circuit Court for Davidson County but later amended the complaint to seek a divorce. The husband contested the wife's right to the divorce and to custody of the children and sought an equitable division of the marital estate. The trial court awarded the wife a divorce on the ground of inappropriate marital conduct and granted her custody of the children. On this appeal, the husband takes issue with various aspects of the division of the marital estate, the provisions for custody and visitation, the awards for spousal and child support, his conviction for criminal contempt, and the awards for the wife's attorney's fees and discretionary costs. We affirm the trial court's judgments in all particulars except for the constraints placed on the husband's dealings with his disability insurance carrier, the disposition of seventy boxes of the husband's personal property, and the award for the wife's unpaid attorney's fees.

## I.

Ginger Dianne Turner and Robert P. Turner, Jr. were married in Nashville on February 29, 1980. Mr. Turner was a practicing trial lawyer and Ms. Turner was a college graduate who had worked for several Nashville companies. After the marriage, Ms. Turner worked in Mr. Turner's law office until their first child was born in June 1985. Their second child was born in February 1988.

The marriage was troubled from the beginning. Ms. Turner left Mr. Turner for three brief periods during the marriage. Eventually, on April 5, 1991, Ms. Turner and the children left home and moved into a domestic violence shelter. One week later, Ms. Turner filed a complaint for separate maintenance and also sought and obtained a temporary restraining order to prevent Mr. Turner from harassing or threatening her or interfering with her custody of the children. Mr. Turner was hospitalized in a South Dakota facility where he was treated for severe depression and other problems. The parties attempted to reconcile after Mr.

Turner returned to Nashville, but five weeks later, Ms. Turner and the children moved into a one-bedroom apartment attached to her parents' home in Gallatin where they have lived ever since.

The litigation was drawn out and difficult with the most serious disputes centering on the custody of the children and the division of the marital property. The parties traded contempt petitions, and in September 1992, Ms. Turner filed an amended complaint requesting a divorce rather than separate maintenance. Mr. Turner was treated for work addiction and depression in Arizona in mid-1992. By late 1992, Mr. and Ms. Turner and their children were in therapy. In an extraordinary letter written to Mr. and Ms. Turner and their lawyers on October 2, 1992, the family's three therapists noted that the "present situation has many of the hallmarks of the murder-suicide syndrome" and strongly recommended that Mr. and Ms. Turner should "appear in each other's presence only when there are others present to buffer the intensity of your present feelings." They also recommended that Mr. and Ms. Turner seek the services of a divorce mediator "for the sake of your children."[1]

In April 1993, Mr. Turner's attending physician certified that Mr. Turner was disabled from practicing as a trial lawyer because of his obsessive-compulsive personality and his predisposition toward depression. Accordingly, in July 1993 Mr. Turner's disability insurance carrier began paying him disability benefits amounting to approximately $12,000 per month. Mr. Turner's efforts since 1993 to establish an office practice have been unsuccessful.

The trial court held a hearing on December 20 and 21, 1993, concerning fault, custody and visitation, and child support. On December 23, 1993, it filed a memorandum opinion awarding Ms. Turner a divorce on the ground of inappropriate marital conduct. Noting that the "children need a safe haven where they are out of the battlefield," the trial court gave Ms. Turner sole custody of the children and defined a specific visitation schedule for Mr. Turner. Instead of finally deciding the issues of spousal and child support, the trial court entered an

---

[1]Mr. Turner later sued the three therapists for defamation and malpractice but voluntarily dismissed the suit seven days after it was filed.

order for temporary support, directing Mr. Turner to pay Ms. Turner $3,500 per month for alimony and child support and permitting Ms. Turner to withdraw approximately $28,500 from Mr. Turner's cash account. An order embodying these decisions was filed on January 18, 1994.

Ms. Turner filed a petition to hold Mr. Turner in criminal contempt in March 1994 because he had refused to pay the $3,500 in monthly spousal and child support required by the January 18, 1994 order. Following a hearing in April 1994, the trial court found Mr. Turner guilty of criminal contempt and gave him the choice of serving ten days in jail or performing 240 hours of community service work. Mr. Turner opted for the community service work and completed his obligation in July 1994 by working at a YMCA.

The trial court held further evidentiary hearings on August 4 and September 23, 1994, concerning the remaining issues in the case. In an order filed on October 5, 1994, the trial court determined the marital home on Nichol Lane was Mr. Turner's separate property but that the increase in the equity of the home during the marriage was part of the marital estate. The trial court also (1) awarded Ms. Turner approximately 40% of the marital estate worth between $729,335 and $767,620;[2] (2) directed Mr. Turner to pay $2,000 in monthly child support and to pay an additional $1,500 per month into an educational trust fund for the children; and (3) awarded Ms. Turner an additional $28,565 for her attorneys' fees[3] and $8,938.75 in discretionary costs.

The trial court also provided Ms. Turner with two types of spousal support. First, it ordered Mr. Turner to pay Ms. Turner rehabilitative alimony in the amount of $1,500 per month for not less than two nor more than three years in order to enable Ms. Turner to obtain a graduate degree. Second, it awarded Ms. Turner her

---

[2]The value of Ms. Turner's share of the marital estate was approximately $299, 450; while the value of Mr. Turner's share was between $429,885 and $468,170. By a later order, Ms. Turner received a 1985 Jeep Wagoneer, and Mr. Turner received a 1992 Jeep Wrangler and a 1980 BMW.

[3]Ms. Turner actually received $42,565 in legal fees; however, $14,000 was disbursed while the divorce proceeding was pending. The trial court directed that $27,464.31 of the $28,565 awarded be paid using the funds already on deposit with the court.

former husband's interest in the Nichol Lane house as alimony in solido. The trial court also gave Mr. Turner the option to purchase the house for $185,000.

As a final matter, the trial court directed Mr. Turner to submit a copy of his disability insurance policy and enjoined him from informing his disability carrier that he intended to resume working as a litigator until he actually established a trial practice. The trial court also directed Mr. Turner to provide his lawyer with copies of any responses to the disability carrier's inquiries regarding his future career plans and ordered Mr. Turner's lawyer to seek court approval of the response "if necessary."

## II.
### CUSTODY AND VISITATION

Mr. Turner takes issue with the trial court's decision to award Ms. Turner custody of their nine and eleven-year-old daughters and to circumscribe his visitation rights more than they had been prior to the custody phase of the trial. He asserts that he is comparatively more fit than Ms. Turner to be the children's custodian and that his limited visitation will interfere with the normal growth of his relationships with his children. The evidence in the record does not compel us to second-guess the trial court's decision.

### A.

Custody and visitation matters are among the most important issues confronting trial courts in divorce cases. *Gaskill v. Gaskill,* 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996). The needs and interests of the children are paramount; while the needs of the parents are secondary. *Lentz v. Lentz,* 717 S.W.2d 876, 877 (Tenn. 1986); *Doles v. Doles,* 848 S.W.2d 656, 661 (Tenn. Ct. App. 1992). Thus, custody decisions are not intended either to punish or to reward the parents, *Turner v. Turner,* 919 S.W.2d 340, 346 (Tenn. Ct. App. 1995), but rather to promote the children's interests by placing them in the environment best suited to their physical and emotional needs. *Luke v. Luke,* 651 S.W.2d 219, 221 (Tenn. 1983); *Gaskill v. Gaskill,* 936 S.W.2d at 630.

As a general rule, the most preferable custody arrangement is one that fosters the children's relationships with both the custodial and non-custodial parent. *Rogero v. Pitt,* 759 S.W.2d 109, 112 (Tenn. 1988); *Pizzillo v. Pizzillo,* 884 S.W.2d 749, 755 (Tenn. Ct. App. 1994). Thus, trial courts should strive to devise custody and visitation arrangements that interfere as little as possible with each parent's relationship with the children. *Taylor v. Taylor,* 849 S.W.2d 319, 331 (Tenn. 1993); *Rust v. Rust,* 864 S.W.2d 52, 56 (Tenn. Ct. App. 1993).

The courts do not employ hard and fast rules to identify the children's best interests in a particular case. *Taylor v. Taylor,* 849 S.W.2d at 327. The inquiry is factually driven and requires the courts to weigh numerous considerations. *Nichols v. Nichols,* 792 S.W.2d 713, 716 (Tenn. 1990); *Rogero v. Pitt,* 759 S.W.2d at 112. These considerations include, but are not limited to

> the age, habits, mental and emotional make-up of the child and the parties competing for custody; the education and experience of those seeking to raise the child; their character and propensities as evidenced by their past conduct; the financial and physical circumstances available in the home of each party seeking custody and the special requirements of the child; the availability of third-party support; the associations and influences to which the child is likely to be exposed in the alternatives afforded, both positive and negative; and where is the greater likelihood of an environment for the child of love, warmth, stability, support, consistency, care and concern, and physical and spiritual nurture.

*Bah v. Bah,* 668 S.W.2d 663, 666 (Tenn. Ct. App. 1983); Tenn. Code Ann. § 36-6-106 (1996). The trial courts employ the comparative fitness analysis to weigh these considerations and, by so doing, determine which of the available custodians is comparatively more fit than the other. *In re Parsons,* 914 S.W.2d 889, 893 (Tenn. Ct. App. 1995); *Bah v. Bah,* 668 S.W.2d at 666.

Parents competing for custody are human beings with their own unique virtues and vices. *Gaskill v. Gaskill,* 936 S.W.2d at 630. Thus, custody and visitation decisions are rarely black and white matters. Because these decisions usually hinge on subtle nuances of the parents' demeanor and credibility, the appellate courts are reluctant to second-guess trial judges who have observed the

witnesses directly. *Scarbrough v. Scarbrough,* 752 S.W.2d 94, 96 (Tenn. Ct. App. 1988). Accordingly, we review custody and visitation decisions de novo on the record with a presumption that the trial court's findings of fact are correct unless the evidence preponderates otherwise. *Nichols v. Nichols,* 792 S.W.2d 713, 716 (Tenn. 1990); *Hass v. Knighton,* 676 S.W.2d 554, 555 (Tenn. 1984); Tenn. R. App. P. 13(d).

## B.
### CUSTODY OF THE CHILDREN

The parties' two daughters have been living with Ms. Turner since the final separation in July 1991. They appear to be doing remarkably well even though they have been at the center of what Mr. Turner's former lawyer referred to as a "war of the experts." Both children have been in therapy intermittently since their parents separated. The trial court itself noted at one point that it was "greatly saddened that these children have been so picked at and scrutinized by so many experts."

Mr. Turner asserts that he is comparatively more fit to be the children's custodian because he continues to live in the marital home and because he is in a position to spend more time with them due to the fact that he is not working. He also insists that the trial court did not give sufficient weight to the opinion of a child psychiatrist who has treated the children but rather was retained to give testimony in the case. This psychiatrist testified that the children should live with their father because Ms. Turner has difficulty setting limits on their behavior.

The expert opinions of therapists who have examined members of a family experiencing the trauma of a divorce can be of great assistance to the courts in determining which parent should be given custody of the children. These opinions, however, cannot supplant the reasoned judgment and discretion of the trial court or of this court. *Jones v. Jones,* 01A01-9601-CV-00038, 1996 WL 512030, at *2 (Tenn. Ct. App. Sept. 11, 1996) (No Tenn. R. App. P. 11 application filed); *Starnes v. Starnes,* App. No. 01A01-9010-CV-00373, 1991 WL 27360, at *3 (Tenn. Ct. App. Mar. 6, 1991) (No Tenn. R. App. P. 11 application filed).

Based on our independent review of the record, we cannot say that the proof fails to support the trial court's decision to place these two children with Ms. Turner. Their mother has been their primary care-giver throughout their lives, and they have been living with her since the parties' separation in mid-1991. While Mr. Turner has been quick to point out Ms. Turner's shortcomings as a parent, we do not expect Ms. Turner to be perfect. She has attempted to provide the children with love, support, and care during this extremely trying period in their lives and by all appearances has performed satisfactorily. Accordingly , we affirm the trial court's decision awarding Ms. Turner sole custody of the children.

## C.

### MR. TURNER'S VISITATION RIGHTS

Mr. Turner also insists that the trial court has impermissibly interfered with his relationship with his daughters by awarding him less visitation than he was permitted prior to the December 1993 hearing. We have determined that Mr. Turner's conduct warranted the changes in his visitation rights.

The trial court originally granted Mr. Turner extemely liberal temporary visitation rights, including one day each weekend, one mid-week overnight visitation each week, and six weeks of visitation during the summer. In its December 23, 1993 order, the trial court eliminated the mid-week visitation and reduced Mr. Turner's summer visitation from six to three weeks. The trial court continued Mr. Turner's regular weekend visitation, made appropriate allowances for the Christmas and Thanksgiving holidays, and provided a schedule for other major three-day weekends. Finally, the trial court permitted Mr. Turner two meetings each year with the children's teachers and directed him to "schedule any athletic, art and church events during his visitation time."

The trial court made these changes in Mr. Turner's visitation because it determined that "[a]ll these parties need some recovery time" and that the "children need to recover from their parents' controversy, if that is at all possible." The proof of Mr. Turner's aggressive involvement in the children's lives supported the trial court's decision then and supports it now. Even though his

visitation rights have been modified, the trial court has provided sufficient opportunity for the development of a healthy relationship between Mr. Turner and his daughters.

## III.
### MR. TURNER'S CHILD SUPPORT OBLIGATION

Mr. Turner asserts that the trial court mistakenly calculated his child support obligation by failing to consider him as self-employed and by failing to deduct his claimed business expenses from his disability insurance income. We have determined that the trial court was not required to deduct business expenses from the payments Mr. Turner was receiving from his disability insurance carrier.

### A.

Child support issues are entrusted to the trial court's discretion. *Campanali v. Campanali,* 695 S.W.2d 193, 196 (Tenn. Ct. App. 1985). This discretion is now circumscribed by the child support guidelines promulgated by the Tennessee Department of Human Services pursuant to Tenn. Code Ann. § 36-5-101(e)(2) (1996). These guidelines assist the courts by providing them with rebuttable presumptions with regard to the proper amount of child support based on the payor spouse's income and the number of children to be supported. *Carden v. Carden,* App. No. 01A01-9502-CH-00042, 1995 WL 689728, at *4 (Tenn. Ct. App. Nov. 22, 1995) (No Tenn. R. App. P. 11 application filed); Tenn. Code Ann. § 36-5-101(e)(1); Tenn. Comp. R. & Regs. r. 1240-2-4-.02(7) (1994). We review child support decisions in accordance with Tenn. R. App. P. 13(d), giving the trial court's factual findings, but not its interpretation of the guidelines, a presumption of correctness. *Lumpkins v. Lumpkins,* App. No. 01A01-9401-CH-00034, 1995 WL 581417, at *2 (Tenn. Ct. App. Oct. 4, 1995) (No Tenn. R. App. P. 11 application filed).

The guidelines have simplified setting child support by providing formulas for determining child support and by limiting the number of variables in the formula. *Kirchner v. Pritchett,* App. No. 01A01-9503-JV-00092, 1995 WL

714279, at *2 (Tenn. Ct. App. Dec. 6, 1995) (No Tenn. R. App. P. 11 application filed). Since the number of children to be supported is usually evident and undisputed, the most frequently contested variable in the formula is the non-custodial parent's income. *Turner v. Turner,* 919 S.W.2d at 344. In the case of highly compensated individuals, the guidelines permit the courts to consider all the non-custodial parent's income. *Nash v. Mulle,* 846 S.W.2d 803, 806 (Tenn. 1993).

## B.

Mr. Turner's litigation practice was once highly successful, but it declined precipitously immediately before the parties separation in 1991. His business income in 1987 and 1988 was $185,872 and $249,654 respectively. In 1989, Mr. Turner's business income slipped to $35,647, and by 1990, his expenses exceeded his receipts by $27,091. After being declared disabled to practice as a litigator in April 1993, Mr. Turner began receiving approximately $12,000 per month in disability benefits from a disability insurance policy he had purchased years before. Mr. Turner kept his office after he was declared disabled but essentially has performed no legal work and has received virtually no income from practicing law since 1991.

The trial court properly determined that Mr. Turner's disability benefits should be treated as gross income for the purposes of the child support guidelines. While these benefits are not specifically included in the definition of "gross income" in Tenn. Comp. R. & Regs. r. 1240-2-4-.03(3)(a) (1994), they are similar to other types of disability income that are specifically included. *See Gonsalves v. Roberts,* 905 S.W.2d 931, 932 (Tenn. 1995) (treating a temporary total worker's compensation disability award as income); Tenn. Comp. R. & Regs. r. 1240-2-4-.03(3)(a) (defining "gross income" to include Title II Social Security Benefits).

Mr. Turner does not directly dispute the characterization of his disability insurance benefits as gross income but insists that his benefits should be considered as "income from self-employment." The reason for this argument is clear. If his disability insurance benefits were to be considered "income from self-

employment," Mr. Turner would be able to reduce the amount of his gross income by deducting his reasonable business expenses, and, by reducing the amount of his gross income, he would be able to reduce the amount of his child support.

Mr. Turner's argument contains two flaws. First, by its very definition, "income from self-employment" includes "income from business operations," and disability insurance benefits are not income from the insured's business operations. Second, the guidelines permit the deduction of "reasonable expenses necessary to produce such income" from a payor spouse's self-employment income. As the trial court pointed out, Mr. Turner was not required to expend any of his claimed monthly business expenses to obtain his disability insurance benefits. Thus, these claimed expenses were not reasonable expenses necessary to produce Mr. Turner's disability insurance benefits.

The trial court correctly treated all of Mr. Turner's disability insurance benefits as gross income for the purpose of setting his child support. Based on Mr. Turner's gross income and on the guidelines' requirement that he pay 32% of his gross income as child support, we conclude that the trial court acted appropriately when it ordered Mr. Turner to pay $2,000 in monthly child support and to deposit $1,500 each month in an educational trust fund for the children's benefit. The trial court also included proper safeguards permitting the modification of either or both of these amounts in light of the uncertain future of Mr. Turner's disability insurance benefits.

## IV.
### THE DIVISION OF MARITAL PROPERTY

Mr. Turner also disputes two aspects of the trial court's division of the marital property. He asserts that the trial court should not have awarded Ms. Turner the appreciation in value of the Nichol Lane house and that the trial court should have awarded him approximately seventy boxes of personal property being stored at Central Van and Storage. We have determined that the appreciation in the value of the Nichol Lane house was marital property and that the trial court acted equitably by awarding it to Ms. Turner. We have also determined, however,

that the trial court should have awarded the seventy boxes stored at Central Van and Storage to Mr. Turner.

## A.

Dividing a marital estate necessarily begins with the classification of the property as either separate or marital property. *McClellan v. McClellan,* 873 S.W.2d 350, 351 (Tenn. Ct. App. 1993). The definitions of "separate property" and "marital property" in Tenn. Code Ann. § 36-4-121(b) (1996) provide the ground rules for the task. Once the property has been classified, the trial court's goal is to divide the marital property in an essentially equitable manner. A division is not rendered inequitable simply because it is not precisely equal, *Ellis v. Ellis,* 748 S.W.2d 424, 427 (Tenn. 1988); *Batson v. Batson,* 769 S.W.2d 849, 859 (Tenn. Ct. App. 1988), or because each party did not receive a share of every piece of marital property. *Brown v. Brown,* 913 S.W.2d 163, 168 (Tenn. Ct. App. 1994).

Dividing a marital estate is not a mechanical process but rather is guided by considering the factors in Tenn. Code Ann. § 36-4-121(c) (1996). Trial courts have wide latitude in fashioning an equitable division of marital property. *Fisher v. Fisher,* 648 S.W.2d 244, 246 (Tenn. 1983); *Brown v. Brown,* 913 S.W.2d at 168. Appellate courts accord great weight to a trial court's division of marital property. *Wilson v. Moore,* 929 S.W.2d 367, 372 (Tenn. Ct. App. 1996); *Edwards v. Edwards,* 501 S.W.2d 283, 288 (Tenn. Ct. App. 1973). Thus, we will ordinarily defer to the trial court's decision unless it is inconsistent with the factors in Tenn. Code Ann. § 36-4-121(c) or is not supported by a preponderance of the evidence. *Brown v. Brown,* 913 S.W.2d at 168; *Mahaffey v. Mahaffey,* 775 S.W.2d 618, 622 (Tenn. Ct. App. 1989); *Hardin v. Hardin,* 689 S.W.2d 152, 154 (Tenn. Ct. App. 1983).

## B.

### THE NICHOL LANE HOUSE

Mr. Turner's assertion that the trial court erred by classifying the appreciation in value of the Nichol Lane house as marital property rests on the title to the property and his insistence that Ms. Turner gave him her interest in the house in 1984. He claims that the trial court should have classified the entire property as separate property because the title was in his name alone when the parties separated in 1991. We find little merit in these arguments.

Mr. Turner acquired the Nichol Lane house in 1975 before he met Ms. Turner. He conveyed the property to his parents in 1976, but they conveyed it back to him in 1980 when he and Ms. Turner were married. He again conveyed the property to his parents in July 1983 during one of the parties' marital altercations, but his parents reconveyed to him and Ms. Turner three months later. The fact that Ms. Turner's name was on the deed apparently upset Mr. Turner, and he accused Ms. Turner of reconciling with him solely to obtain possession of the house. In order to reduce the stress on the marriage, Ms. Turner quitclaimed her interest in the house to Mr. Turner in June 1984.

The classification of property as separate or marital under Tenn. Code Ann. § 36-4-121 depends largely on the manner in which the parties used the property during the marriage, *Mahaffey v. Mahaffey,* 775 S.W.2d at 624, rather than on the property's record title. *See Jones v. Jones,* 597 S.W.2d 886, 887 (Tenn. 1979); *Langford v. Langford,* 220 Tenn. 600, 604, 421 S.W.2d 632, 634 (1967); *Robinette v. Robinette,* 726 S.W.2d 524, 525 (Tenn. Ct. App. 1986).

While there is no question that the Nichol Lane house was in Mr. Turner's name at the time of the divorce, there is likewise no question that the parties used this house as their marital home since 1980. Even if Mr. Turner's efforts to keep the title to the house in his own name would support a conclusion that the house remained his separate property, Tenn. Code Ann. § 36-4-121(b)(1)(B) provides that the increase in value during the marriage of separate property will be considered marital property if each party contributed substantially to its preservation and appreciation. Substantial contributions include a spouse's non-monetary contributions as a parent and homemaker. Tenn. Code Ann. § 36-3-121(b)(1)(C). Accordingly, the trial court had ample legal and factual basis for

classifying the appreciation in the value of the Nichol Lane house as marital property.

## C.
### THE BOXES OF PERSONAL PROPERTY

The parties vigorously contested the distribution of several items of furniture and approximately seventy boxes of clothes and fishing and boating equipment that had been stored at Central Van and Storage. Mr. Turner asserted that he had sold the furniture to a longtime friend for $3,500 to raise money during the divorce proceedings. Ms. Turner responded that Mr. Turner and his friend had contrived this story to cheat her out of $8,500 worth of furniture, and the record contains some evidence to support her assertion. The trial court awarded the property in storage to Ms. Turner.

Mr. Turner now insists that the property remaining in storage consists of clothes, personal effects, and fishing and boating equipment having little value to Ms. Turner. While she does not contest Mr. Turner's characterization of the property, Ms. Turner insists that Mr. Turner should not receive this property because he attempted to perpetrate a fraud on both her and the trial court. Fault is not a consideration in the division of property, Tenn. Code Ann. § 36-4-121(a)(1), and the court had other means at its disposal to address Mr. Turner's conduct during the divorce proceedings. Accordingly, we have determined that the trial court should have awarded the seventy boxes in storage at Central Van and Storage to Mr. Turner.

## V.
### MR. TURNER'S SPOUSAL SUPPORT OBLIGATIONS

Mr. Turner is dissatisfied with all three aspects of the award for spousal support. He asserts that the trial court erred by awarding Ms. Turner his interest in the Nichol Lane house as alimony in solido, that Ms. Turner did not need rehabilitative alimony, and that Ms. Turner was not entitled to an award for her legal expenses because she had received enough liquid assets to be able to defray

her legal expenses herself. While the trial court did not err in awarding Ms. Turner alimony in solido and rehabilitative alimony, we have determined that the award for attorney's fees should be modified.

## A.

There are no hard and fast rules for determining when a person should be required to support a former spouse. *Crain v. Crain*, 925 S.W.2d 232, 233 (Tenn. Ct. App. 1996); *Cranford v. Cranford,* 772 S.W.2d 48, 50 (Tenn. Ct. App. 1989). These decisions depend on the unique facts of each case and on the thoughtful balancing of many factors, including those identified in Tenn. Code Ann. § 36-5-101(d)(1). *Hawkins v. Hawkins,* 883 S.W.2d 622, 625 (Tenn. Ct. App. 1994); *Loyd v. Loyd,* 860 S.W.2d 409, 412 (Tenn. Ct. App. 1993). While courts may consider fault in this context, spousal support awards are not intended to be punitive. *Brown v. Brown,* 913 S.W.2d at 169; *McClung v. McClung,* 29 Tenn. App. 580, 584, 198 S.W.2d 820, 822 (1946).

Trial courts have broad discretion in determining whether to award spousal support, as well as the nature, duration, and amount of the award. *Wilson v. Moore,* 929 S.W.2d at 375; *Hawkins v. Hawkins,* 883 S.W.2d 622, 625 (Tenn. Ct. App. 1994). As a general matter, the appellate courts are disinclined to alter a trial court's decision regarding spousal support unless it is not supported by the evidence or is inconsistent with the policies embodied in the applicable statutes. *Brown v. Brown,* 913 S.W.2d at 169; *Gilliam v. Gilliam,* 776 S.W.2d 81, 86 (Tenn. Ct. App. 1988).

The current support statutes reflect a preference for temporary, rehabilitative support as opposed to long-term support. *Wilson v. Moore,* 929 S.W.2d at 375; Tenn. Code Ann. § 36-5-101(d)(1) (stating the legislative intent that economically disadvantaged spouses should be rehabilitated whenever possible). This preference does not, however, displace other traditional types of spousal support. *See Aaron v. Aaron,* 909 S.W.2d 408, 411 (Tenn. 1995) (awarding permanent alimony); *Isbell v. Isbell,* 816 S.W.2d 735, 739 (Tenn. 1991) (authorizing long term support); *Cranford v. Cranford,* 772 S.W.2d at 51

(awarding permanent alimony). Trial courts have the prerogative to determine which type of support best fits the facts of each particular case and may, when appropriate, award a spouse several different types of support.

## B.
### THE ALIMONY IN SOLIDO AWARD

The fair market value of the Nichol Lane house at the time of the divorce was $187,000. The trial court found that the house's value had increased by $95,000 during the marriage and awarded this appreciation to Ms. Turner as marital property. The trial court apparently found that the house was Mr. Turner's separate property but awarded its residual, pre-marriage value - $92,000 - to Ms. Turner as alimony in solido. The trial court gave Mr. Turner the option of conveying the house to Ms. Turner or purchasing it for $185,000. Mr. Turner exercised the right to purchase the house by paying $185,000 into court. Accordingly, Ms. Turner received $92,000 in cash as alimony in solido.

Mr. Turner objects to the amount of the alimony in solido award, although his reasoning is somewhat convoluted. In his view, this award is unfair because Ms. Turner has received over one-half of the value of the marital real property. He reasons that the total value of the marital real property is $280,000[4] and that Ms. Turner is receiving more than her fair share of this property because she is receiving $187,000. Apparently, Mr. Turner believes that the alimony in solido award should be reduced by $45,000.

Mr. Turner's argument is flawed in two significant ways. First, he overlooks that the $187,000 awarded to Ms. Turner consisted of marital property ($95,000) and alimony in solido ($92,000). Second, he ignores the principle that the distribution of marital property need not be equal to be equitable. *Ellis v. Ellis,* 748 S.W.2d at 427; *Batson v. Batson*, 769 S.W.2d at 859. When viewed in the context of the division of marital property, Ms. Turner received approximately forty percent of the marital estate. This division was equitable. When viewed in

---

[4]The fair market value of the Hillsboro Circle property was $185,000 and the value of the appreciation in the value of the Nichol Lane house during the marriage was $95,000.

the context of spousal support, the alimony in solido award was appropriate in light of the duration of the marriage, the parties' separate assets, the share of marital assets each party received, the parties' contributions to the marriage, and the parties' respective responsibility for the breakup of the marriage.

## C.
### THE REHABILITATIVE ALIMONY

Ms. Turner had returned to school to obtain a graduate degree in English by the time of the divorce hearing. Even though Mr. Turner questioned Ms. Turner's motivation and the need for this degree, the trial court determined that Ms. Turner would be entitled to $1,500 per month in rehabilitative support for not less than two nor more than three years. The trial court conditioned this order on Ms. Turner's taking a particular number of courses and maintaining a certain grade point average. Mr. Turner now insists that Ms. Turner does not need this rehabilitative support in light of the marital property and alimony in solido she has already received. Ms. Turner responds that this support is appropriate in light of the parties' pre-divorce standard of living.

One of the chief goals in every divorce case is to mitigate the economic hardship that divorce causes to innocent spouses. As laudatory as this goal may be in principle, it is generally difficult to achieve because both spouses usually share the responsibility for the divorce and because, as an economic reality, it costs more for two persons to live apart than it does for them to live together. Seldom do divorcing parties have sufficient assets or income to enable one or both spouses to maintain their pre-divorce standard of living. Thus, as a general rule, our desire to shield an innocent spouse from the harsh economic realities of divorce must give way to a reasoned application of the factors in Tenn. Code Ann. § 36-5-101(d)(1). *Brown v. Brown,* 913 S.W.2d at 169.

The most common factors influencing spousal support decisions are the need of the spouse seeking support and the ability of the obligor spouse to pay. *Crain v. Crain,* 925 S.W.2d at 234; *Hawkins v. Hawkins*, 883 S.W.2d at 625. In the context of rehabilitative support, the trial court must consider the age and

education of the spouse seeking support, the availability of training or education that will enable the spouse to become more self-supporting, and the ability of the spouse to acquire this additional training or education.

Ms. Turner is presently 43-years-old. She has a college degree and is in good health. While she has been out of the workforce for a number of years, she has a demonstrated ability to find gainful employment and has now decided to enter the teaching profession. Obtaining an advanced degree will increase her employability and will also enhance her potential earnings. Accordingly, the trial court had ample basis to conclude that Ms. Turner's decision to seek additional education was reasonable. The trial court's decision to require Mr. Turner to pay for this education was also reasonable for two reasons. First, Mr. Turner is financially able to pay for this education. Second, Ms. Turner's opportunity to accrue pension benefits will be impaired because of her late re-entry into the workforce. She will need the assets received in the divorce to support herself after she is no longer able to work. Accordingly, the trial court properly decided that Ms. Turner should not be required to use the assets received in the divorce to obtain her graduate degree.

## D.
### THE AWARD FOR ATTORNEY'S FEES

In addition to the $14,000 in pendente lite attorney's fees, the trial court awarded Ms. Turner another $28,565 to defray part of her attorney's fees. Mr. Turner takes issue with this award because Ms. Turner has received sufficient other liquid assets which enable her to pay for her own legal expenses. We have determined that the award for attorney's fees should be further reduced.

The courts consider an award to defray all or part of the legal expenses incurred in a divorce case as an additional support award. *Gilliam v. Gilliam,* 776 S.W.2d at 86; *Raskind v. Raskind,* 45 Tenn. App. 583, 601, 325 S.W.2d 617, 625 (1959). These awards are appropriate when an economically disadvantaged spouse lacks funds to defray his or her legal expenses, *Harwell v. Harwell,* 612 S.W.2d 182, 185 (Tenn. Ct. App. 1980), but are inappropriate when the spouse requesting the award is able to pay his or her own lawyer either from his or her

own earnings or from the assets received in the divorce. *Inman v. Inman,* 811 S.W.2d 870, 874 (Tenn. 1991); *McCarty v. McCarty,* 863 S.W.2d 716, 722 (Tenn. Ct. App. 1992).

Awards to help defray a party's legal expenses in a divorce case are based on need, not on conduct of the litigation. Other more appropriate sanctions are available when a party abuses the litigation process. Tenn. R. Civ. P. 11, for example, permits the recovery of legal expenses incurred in responding to groundless pleadings and motions, and Tenn. R. Civ. P. 37 provides for monetary sanctions for abuse of the discovery process. *See Mansfield v. Mansfield,* App. No. 01A01-9412-CH-00058, 1995 WL 643329, at *5 (Tenn. Ct. App. Nov. 3, 1995) (No Tenn. R. App. P. 11 application filed). Ms. Turner did not pursue either of these sanctions in this proceeding. Accordingly, her right to an additional award to defray her legal expenses must be judged using the traditional standards applicable to such awards.

The trial court awarded Ms. Turner over $200,000 in cash as a result of the division of the marital property and alimony in solido. She should be able to earn a comfortable living once she completes her graduate education and enters the job market. Prudence and necessity will require Ms. Turner to allocate a great portion of the funds obtained in the divorce to acquire suitable housing for herself and the children and to make an adequate provision for her retirement. However, the liquid assets she has received in this divorce and her anticipated earnings do not leave her completely unable to pay her lawyers. Thus, we have determined that Ms. Turner should be responsible for a portion of her legal expenses.

Mr. Turner is financially able to pay a portion of Ms. Turner's attorney's fees. He has received valuable capital assets in the divorce and is receiving over $12,000 per month in disability income. Based on Ms. Turner's need and Mr. Turner's ability to pay, we have determined that Mr. Turner should pay Ms. Turner an additional $16,000 to help her defray her legal expenses. Thus, on remand, the portion of the trial court's order awarding Ms. Turner $28,565 for attorney's fees should be reduced to $16,000.

# VI.

## Mr. Turner's Criminal Contempt Conviction

The trial court cited Mr. Tuner for criminal contempt in April 1994 because of his willful failure to pay one monthly installment of the spousal and child support required by its January 18, 1994 order. Mr. Turner now asserts that the evidence preponderates against this finding. The standard for reviewing the evidentiary support for a conviction for criminal contempt requires us to review the record to determine whether the evidence is sufficient to support the finding of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e); *see also Gunn v. Southern Bell Tel. & Tel. Co.,* 201 Tenn. 38, 42, 296 S.W.2d 843, 845 (1956); *Thigpen v. Thigpen,* 874 S.W.2d 51, 53 (Tenn. Ct. App. 1993). We have determined that the evidence supports beyond a reasonable doubt the trial court's conclusion that Mr. Turner willfully violated the January 18, 1994 order.

## A.

Following the conclusion of the first phase of the hearings, the trial court filed a memorandum opinion on December 23, 1993, directing Mr. Turner to "pay Ms. Turner the sum of $3,500 per month for alimony and child support, beginning December 30, 1993." Since he had already paid Ms. Tuner $3,000 during the first week of December 1993, Mr. Turner did not pay Ms. Turner $3,500 on December 30, 1993, but rather delayed making his first payment until January 28, 1994. Ms. Turner filed a petition on February 1, 1994, seeking to hold Mr Turner in criminal contempt for his willful failure to pay her $3,500 on December 30, 1993.

During the next two months, Mr. Turner paid Ms. Turner $3,500 on February 28 and March 31, 1994. Accordingly, by the April 12, 1994 hearing, Mr. Turner had made only three of the four monthly payments required by the January 18, 1994 order that embodied the trial court's December 23, 1993 memorandum opinion. Rather than asserting financial inability, Mr. Turner announced at the contempt hearing that he did not think he should have been required to pay Ms. Turner $3,500 on December 30, 1993, because he had already

paid her $3,000 earlier in the month. He offered no explanation for his failure to seek a modification or clarification from the trial court concerning this issue.

**B.**

Criminal contempt sanctions serve as punishment for willfully refusing to comply with a court's order. *Thigpen v. Thigpen,* 874 S.W.2d at 53; *Storey v. Storey,* 835 S.W.2d 593, 599 (Tenn. Ct. App. 1992). Their purpose is to vindicate the authority of the law and the court as an organ of society. *State ex rel. Agee v. Chapman,* 922 S.W.2d 516, 519 (Tenn. Ct. App. 1995); *Robinson v. Gaines,* 725 S.W.2d 692, 694 (Tenn. Crim. App. 1986). The punishment for criminal contempt is fixed, not conditional, and must be served even if the contemner later complies with the court's order. *Robinson v. Gaines,* 725 S.W.2d at 694.

The evidence adduced at the April 12, 1994 hearing demonstrates beyond a reasonable doubt that Mr. Turner was aware of the trial court's December 23, 1994 memorandum opinion and that he specifically understood that the trial court had directed him to pay Ms. Turner $3,500 on December 30, 1993. The evidence also demonstrates that Mr. Turner could have paid the money to Ms. Turner but chose not to because he had already paid Ms. Turner $3,000 earlier in the month. He assumed that his earlier payment obviated the necessity of paying Ms. Turner $3,500 on December 30, 1993. As a practicing litigator and officer of the court, Mr. Turner was well acquainted with the importance of complying with court orders and with the necessity of seeking relief from these orders rather than unilaterally ignoring them. Since Mr. Turner offered no cogent reason for ignoring the trial court's December 23, 1993 memorandum opinion, the trial court had ample grounds to find him in criminal contempt.

**VII.**

**COMMUNICATIONS WITH THE DISABILITY INSURANCE CARRIER**

The trial court's October 5, 1994 order placed restrictions on Mr. Turner's communications with his disability insurance carrier concerning his intentions to resume a litigation practice. Mr. Turner asserts that this order interferes with his

contractual obligations under the disability policy. For her part, Ms. Turner insists that the restrictions will prevent Mr. Turner from retaliating against her and their children by spitefully cutting off his family's only source of support. We have determined that the trial court's restrictions should be modified.

Mr. Turner has earned no income from the practice of law since 1990. By his own admission, his mental condition has rendered him disabled since prior to April 1991. While such a turn of events would be catastrophic for most persons, Mr. Turner had the foresight to purchase a disability insurance policy under which he has been receiving approximately $12,000 per month in disability benefits since July 1993. At the outset, the policy required Mr. Turner to provide proof of his continuing disability each month, but, beginning in 1994, his disability insurance carrier only required biannual proof of disability.

Mr. Turner has attempted without success to resume some sort of law practice. As late as April 1994, he informed the trial court that he did not intend to resume practicing as a litigator. Four months later, however, he informed the trial court that he was greatly encouraged by his prognosis and that he intended to inform his disability insurance carrier of his intention to begin a litigation practice. Responding to this announcement, the trial court stated:

> But I want it to be an order coming out of this today, that there is to be no communication from Mr. Turner to his insurance company about what he undertakes to do unless he is of leave of this court to do that.

> *     *     *

> And I don't really care whether you want to take up the practice of trial law or not. This family needs the support. And when Mr. Turner can establish that he can go be a trial lawyer, or be a professor, or sell clothes at Levi's [sic], I don't care what he does.

> But if there is going to be a threshold point where he is going to stop getting these payments, I want to know about it and I want to be the first to know. And then we'll make some determination. Because I assume that these disability payments are also incremental.

> *     *     *

-22-

> We've been paying her thirty-five hundred dollars and we have been setting child support with that and until we even begin to approach that from other sources, there is no reason why these disability payments cannot continue because that's why you pay for disability payments.
>
> So, with that caveat, I'm happy to hear what he is planning to do, but I don't what one shred of communication between Mr. Turner and Provident unsolicited, because the last statement we have from his physician is that he is disabled from practicing as an attorney. And I don't have anything showing differently.

Consistent with its comments from the bench, the trial court's October 5, 1994 order provided:

> It is, further ORDERED that the Husband is restrained and enjoined from contacting Provident Insurance Company and advising them that he plans to become a trial attorney until he has established a trial practice.
>
> It is further ORDERED that in the event the Husband receives any unsolicited communication from the insurance company inquiring regarding his future career plans, the Husband shall provide same to his attorney, and if necessary in the option of Husband's counsel, obtain court approval to fashion a response.

Mr. Turner's statements about his desire to resume litigating presented the trial court with a dilemma. On one hand, all the available medical evidence and Mr. Turner's own unsuccessful efforts, indicated that Mr. Tuner was incapable of maintaining a successful litigation practice. On the other hand, an independent psychiatrist had informed Mr. Turner that his prognosis for a full recovery at some future time was good. The trial court properly took steps to guard against the premature, unwarranted curtailment of Mr. Turner's disability benefits. However, it should have balanced Mr. Turner's obligation to cooperate with his disability insurance carrier with Ms. Turner's justified concern that Mr. Turner might jeopardize his only source of income simply to retaliate against his family.

-23-

Any judicial oversight of Mr. Turner's dealings with his disability insurance carrier must take into account that Mr. Turner is not entitled to receive disability benefits if he is no longer disabled. Mr. Turner's policy defines disability in terms of inability "to perform the substantial and material duties of your occupation," not in terms of income earned. Thus, it is possible that Mr. Turner would not be considered disabled under his policy if he resumed his litigation practice but failed to generate income commensurate with his disability benefits. After all, it would be reasonable to expect that Mr. Turner will require some time to rebuild a litigation practice after being away from it for so long.

The trial court erred by equating Mr. Turner's disability to practice as a litigator with his ability to earn income. Accordingly, the October 5, 1994 order should be modified by deleting the restriction against Mr. Turner advising his disability insurance carrier of his plans to resume his litigation practice "until he has established a trial practice." Instead, the trial court should require Mr. Turner to notify both the court and Ms. Turner before he informs his disability insurance carrier that he is no longer disabled. Upon receipt of this notice, the trial court may conduct a hearing, either on its own motion or at Ms. Turner's request, concerning Mr. Turner's disability status. Mr. Turner shall have the burden of proving by competent medical evidence that he is no longer disabled. If Mr. Turner carries his burden, the court must permit him to notify his disability insurance carrier that he is no longer disabled. If he fails to satisfy the trial court that he is no longer disabled, the trial court may enjoin Mr. Turner from informing his disability insurance carrier that he is no longer disabled.

The trial court should place similar restrictions on Mr. Turner's responses to inquiries from his disability insurance carrier. Before responding that he is no longer disabled, Mr. Turner must provide advance notice to both the trial court and Ms. Turner so that a hearing on his disability status, if necessary, may be conducted before he sends his response to his insurance company.

## VIII.
### THE AWARD FOR DISCRETIONARY COSTS

As a final matter, Mr. Turner takes issue with the trial court's decision to require him to reimburse Ms. Turner for $8,938.35 in discretionary costs. He argues that Ms. Turner received sufficient liquid assets to pay these costs. We have determined that the trial court properly taxed these costs to Mr. Turner in accordance with Tenn. R. Civ. P. 54.04(2).

Trial courts may tax certain litigation costs against the losing party. *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 902 (Tenn. 1992); *Lock v. National Union Fire Ins. Co.,* 809 S.W.2d 483, 490 (Tenn. 1991). Tenn. R. Civ. P. 54.04(2) lists the taxable costs, and courts generally award these costs, if they are reasonable, to prevailing parties who file a timely, properly supported motion. *Dent v. Holt,* App. No. 01A01-9302-CV-00072, 1994 WL 440916, at *3 (Tenn. Ct. App. Aug. 17, 1994) (No Tenn. R. App. P. 11 application filed).

Ms. Turner supported her motion for costs with affidavits documenting $12,373.29 in litigation expenses, including expert witness fees, court reporters' fees, and other costs. The trial court scrutinized these affidavits and disallowed the expenses for such things as an investigator, copies of bank records, copying expenses, and for fees for service of process. Based on our independent review of the record, we decline to find that the trial court erred by taxing $8,938.35 in discretionary costs to Mr. Turner.

## IX.

We affirm the trial court's orders and judgments as modified herein and remand the case to the trial court for the appropriate modification of its orders consistent with this opinion and for what ever other proceedings may be required. We also tax the costs of this appeal in equal proportions to Robert Phillips Turner, Jr. and his surety and to Ginger Dianne Griggs Turner for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

CONCUR:

-25-

_____
SAMUEL L. LEWIS, JUDGE


_____
BEN H. CANTRELL, JUDGE