Diana Pearl PIZZILLO,
Plaintiff/Respondent/Appellee,

v.

Gabriel Anthony PIZZILLO, Jr.,
Defendant/Petitioner/Appellant.

Court of Appeals of Tennessee,
Middle Section,
at Nashville.

June 3, 1994.

John D. Kitch, Nashville, for the plaintiff/respondent/appellee.

Robert Todd Jackson, Robert L. Jackson, Nashville, for the defendant/petitioner/appellant.

### OPINION

KOCH, Judge.

This appeal involves the visitation arrangements for an eleven-year-old girl and her father. Approximately one year after the divorce, the father filed a petition in the Probate Court of Davidson County[1] seeking specific visitation with his daughter and son. The mother opposed the father's request because she believed that he had sexually abused his daughter and a teenage niece. Following a series of hearings before the probate court and a special master, the probate court declined to increase the father's visitation with his daughter and ordered the father to pay all the costs, the expert witness fees, and the mother's legal expenses. The father has appealed. We vacate the order and remand the case for further proceedings.

---

1. The Probate Court of Davidson County has jurisdiction to hear domestic relations cases by virtue of Act of March 18, 1982, ch. 279, § 2, 1982 Tenn.Priv.Acts 177, 178 which gives the court concurrent jurisdiction with circuit and criminal courts in all matters.

## I.

Gabriel Anthony Pizzillo, Jr. and Diane Pearl Pizzillo had two children during their marriage. Kaleena Marie Pizzillo was born in March 1983, and Michael Anthony Pizzillo in August 1985. The Pizzillos' relationship was not stable, and by 1986 they were in counselling for chronic arguing and verbal fighting. They eventually separated in April 1987 after Mr. Pizzillo's teenage niece accused him of sexual abuse.

In June 1987 the Pizzillos' four-year-old daughter told her maternal grandmother that her father had sexually abused her. This statement led to an investigation by the Department of Human Services and eventually to criminal charges against Mr. Pizzillo. Mr. Pizzillo insisted that he was innocent; however, he followed his attorney's advice to accept pretrial diversion rather than standing trial. On September 24, 1987, Mr. Pizzillo and the district attorney general signed a memorandum of understanding containing an admission that he sexually abused his daughter and niece. Mr. Pizzillo also agreed to pretrial diversion for two years, to seek psychiatric counseling, and to pay for the psychiatric therapy of his daughter and niece.

Ms. Pizzillo filed for divorce. On June 30, 1988, the Pizzillos entered into a marital dissolution agreement in which they agreed that Ms. Pizzillo would receive a divorce on the ground of irreconcilable differences and that she would receive custody of their two children. They also agreed that Mr. Pizzillo would be entitled to supervised visitation with his son but that visitation with his daughter would await the recommendations of the Luton Community Mental Health Center. On August 4, 1988, the Davidson County Probate Court entered a final decree of divorce consistent with the marital dissolution agreement.

Mr. Pizzillo filed a petition in November 1989 seeking specific visitation with both his children and to hold Ms. Pizzillo in contempt for impeding his visitation with his son. Mr. Pizzillo remarried in June 1990 and also amended his petition to request unsupervised visitation with his son. In response to these petitions, the probate court appointed Dr. Louise Strang, a clinical psychologist, to evaluate the two children and their parents. Dr. Strang filed a report in June 1991 recommending expanded visitation with both children, and the probate court entered an order on October 23, 1991 permitting Mr. Pizzillo limited, supervised visitation with his daughter and expanded visitation with his son. The probate court left open the possibility of expanding Mr. Pizzillo's visitation rights further "under such conditions and at such times as recommended by the psychologist and approved by the court."

In April 1992, Dr. Cathryn Yarbrough, the clinical psychologist supervising the visitations between Mr. Pizzillo and his daughter, recommended expanding the supervised visitations with the use of non-professional supervisors. Ms. Pizzillo objected to permitting visitation between Mr. Pizzillo and his daughter without a psychologist present because she did not believe the child was emotionally prepared for these visits and because Mr. Pizzillo continued to insist that he had not sexually abused his daughter. Following a May 1992 hearing, the probate court appointed Dr. William D. Kenner, a child psychiatrist, to interview Mr. Pizzillo regarding the allegations of sexual abuse and to report the results of his evaluation to the court. Dr. Kenner filed a report in August 1992 finding that "Mr. Pizzillo's children would benefit from visiting with their father in an unsupervised setting as recommended by Cathryn Yarbrough, Ph.D."

The probate court conducted another hearing in October 1992 and entered an order on November 17, 1992 rejecting the visitation recommendations of Dr. Strang, Dr. Yarbrough, and Dr. Kenner. The probate court's action resulted from its concern over Mr. Pizzillo's denial that he had sexually abused his daughter despite his admission in the September 1987 memorandum of understanding. The probate court also directed Mr. Pizzillo to pay for all the costs, expert fees, and Ms. Pizzillo's legal expenses associated with the proceeding. This appeal followed.

## II.

We turn first to the admissibility of the September 1987 memorandum of under-

standing between Mr. Pizzillo and the district attorney general. An admission against interest is generally admissible under Tenn. R.Evid. 803(1.2) as an admission of a party opponent. The expunction of the memorandum of understanding, however, renders inadmissible both the memorandum of understanding itself and any admissions against interest contained in it.

### A.

The complaints about Mr. Pizzillo's conduct with his daughter and niece led to the filing of two aggravated sexual battery charges against him. Acting on the advice of counsel, Mr. Pizzillo accepted the district attorney general's offer to enter into a two-year pretrial diversion program in lieu of entering a formal plea or standing trial on the charges. Part of the agreement included the entry of a formal memorandum of understanding pursuant to Tenn.Code Ann. § 40–15–105 (Supp.1993).

On September 24, 1987, the criminal court approved and filed an agreed order incorporating the memorandum of understanding. Mr. Pizzillo never entered a formal plea but admitted in the memorandum of understanding that he had unlawful sexual contact with his daughter and niece. He also agreed to seek therapy for himself and to pay for his daughter's and niece's therapy. In return, the State agreed to reduce the charges to attempt to commit a felony, to continue the case for two years, and to dismiss the charges with prejudice if Mr. Pizzillo successfully completed the pretrial diversion program and adhered to all the conditions of the memorandum of understanding.

Mr. Pizzillo successfully completed the pretrial diversion program in September 1989. Thereafter, the criminal court dismissed the charges with prejudice in accordance with Tenn.Code Ann. § 40–15–105(e). After the dismissal of the charges, the criminal court also expunged all public records of the charges pursuant to Tenn.Code Ann. § 40–32–101(a)(1) (1990).

The memorandum of understanding governed the visitation arrangements between Mr. Pizzillo and his children until Mr. Pizzillo successfully completed his pretrial diversion program in September 1989. Thereafter, the memorandum of understanding provided that the probate court would assume jurisdiction over the visitation issues since it was the court with jurisdiction over the Pizzillos' divorce. As soon as the criminal court dismissed the charges against him, Mr. Pizzillo requested the probate court to expand his visitation rights with both his children.

Ms. Pizzillo vigorously opposed Mr. Pizzillo's request for expanded visitation. Her opposition was due, at least in part, to Mr. Pizzillo's insistence that he had never sexually abused his daughter. In an effort to contradict these denials, Ms. Pizzillo filed a copy of the expunged September 1987 memorandum of understanding with the probate court. The trial court considered the memorandum of understanding over Mr. Pizzillo's objections and, in fact, denied Mr. Pizzillo expanded visitation because he was denying committing the very acts he had admitted committing in the memorandum of understanding.[2]

### B.

Admissions by a party opponent are admissible as exceptions to the hearsay rule. Tenn.R.Evid. 803(1.2)(A). The factual statements contained in pleadings filed in other cases are admissions of a party opponent, and thus they may be received into evidence when they are inconsistent with the pleader's contentions in the present case. *Pankow v. Mitchell,* 737 S.W.2d 293, 296 (Tenn.Ct.App.1987). They need not be verified to be admissible, and they continue to be admissible even after the case in which they were filed has been withdrawn or dismissed. *Pankow v. Mitchell,* 737 S.W.2d at 297 (former pleadings admissible after the case has been dismissed); *Bowers v. Potts,* 617 S.W.2d 149, 154 (Tenn.Ct.App.1981) (verification not required).

---

2. The trial court stated: "I think this is very important. Your client [Mr. Pizzillo] went to criminal court and entered a plea, wherein I realize it was a best-interest plea, but as a condition of that he admitted to abusing this child.... [I]t seems like to me he's going to have to face that situation. And as I have said before, I am really not concerned with his rights."

Mr. Pizzillo's admission contained in the September 1987 memorandum of understanding would be admissible using these principles. Memoranda of understanding are, however, unique documents whose use in later proceedings must be consistent with the statutes authorizing them and governing their use. Thus, we must also look to Tenn. Code Ann. §§ 40–15–105 and 40–32–101.

### PRETRIAL DIVERSION STATUTES

■ Tenn.Code Ann. § 40–15–105 authorizes district attorneys general to permit certain first-offenders to enter a pretrial diversion program before pleading to or being tried for the charges against them.[3] Persons who receive pretrial diversion are not required to admit or plead guilty to the charges against them, *State v. King,* 640 S.W.2d 30, 33 (Tenn.Crim.App.1982), but are required to execute a memorandum of understanding containing the terms and conditions of their pretrial diversion program. Tenn.Code Ann. § 40–15–105(a)(2). The prosecution is suspended for up to two years once the trial court approves the memorandum of understanding. Tenn.Code Ann. § 40–15–105(b)(2). All pending charges must be dismissed with prejudice upon the successful completion of the diversion program. Tenn. Code Ann. § 40–15–105(e).

One of the primary goals of pretrial diversion is to avoid placing the permanent taint of criminality on persons whose criminal conduct is uncharacteristic of their prior social history. *State v. Nease,* 713 S.W.2d 90, 91–92 (Tenn.Crim.App.1986). The persons who are most suited for pretrial diversion are those who can demonstrate their ability to meet the ordinary obligations of citizenship and who have the present ability and incentive to act within the law.

The purposes of pretrial diversion can best be realized when district attorneys general are able to conduct thorough and candid inquiries into a defendant's background. Thus, the pretrial diversion statute promotes full and candid discussions and negotiations by limiting the later admissibility of information obtained during pretrial diversion discussions. Tenn.Code Ann. § 40–15–105(a)(3) provides:

> The memorandum of understanding may include stipulations concerning the admissibility in evidence of specified testimony, evidence or depositions if the suspension of the prosecution is terminated and there is a trial on the charge; however, no confession or admission against interest of the defendant obtained during the pendency of and relative to the charges contained in the memorandum of understanding shall be admissible in evidence for any purpose, including cross-examination of the defendant.

*See also* 9 Tenn.Practice—Criminal Practice & Procedure § 11.20 (1984).

This appeal requires us to determine the scope of Tenn.Code Ann. § 40–15–105(a)(3)'s restriction against the later admissibility of an accused's confession or admission against interest. Mr. Pizzillo asserts that the restriction applies to all future criminal or civil proceedings concerning the events that gave rise to the charges covered by the memorandum of understanding. On the other hand, Ms. Pizzillo asserts that the restriction is limited to later criminal proceedings following the termination of the memorandum of understanding in accordance with Tenn.Code Ann. § 40–15–105(d).

The language at issue on this appeal appears in the second clause of a compound sentence. The conjunctive adverb, "however", separates the two clauses, and thus the second clause is subordinate to the first. The subordinate clause functions as an adjectival modifier of the noun phrase "testimony, evidence or depositions" appearing in the first clause. The first clause provides for the future use of "specified testimony, evidence or depositions;" while the second clause creates an exception to the first clause by stating categorically that "no confession or admission against interest" shall be admissible. The restriction in the second clause must be

---

**3.** Pretrial diversion under Tenn.Code Ann. § 40–15–105 must be distinguished from judicial diversion under Tenn.Code Ann. § 40–35–313 (1990). Only trial courts can grant judicial diversion, and then only after the defendant pleads or is found guilty. *State v. Carr,* 861 S.W.2d 850, 858 (Tenn.Crim.App.1993).

read in conjunction with the remainder of the statute and, therefore, relates only to later criminal trials on the charge itself.

Tenn.Code Ann. § 40–15–103's legislative history reinforces the statute's grammatical construction. The language at issue was added to the bill when it reached the floor of the House of Representatives on May 7, 1975.[4] At that time, the bill's sponsor explained that the purpose of the amendment was to protect

> the right of a person who participates in the program if the case later goes to trial by providing that admissions cannot be used against him if he participates in the voluntary program prior to a trial.

We find, accordingly, that Tenn.Code Ann. § 40–15–105(a)(3)'s restriction against the later use of an accused's confessions or admissions against interest applies only to criminal trials involving the same charge contained in the memorandum of understanding. It does not apply to later civil proceedings.

### EXPUNGEMENT STATUTES

■ One issue remains with regard to the admissibility of the admission against interest in Mr. Pizzillo's September 1987 memorandum of understanding. Even though the pretrial diversion statute does not prevent the document's use as evidence, we must also weigh the effect of the criminal court's order directing that all public records with regard to the charges connected with the memorandum of understanding be expunged in accordance with Tenn.Code Ann. § 40–32–101. We find that the expunction of this record rendered it inadmissible in any subsequent criminal or civil proceeding.

■ All persons charged with a misdemeanor or felony may request the removal and destruction of all public records concerning the charge if the charges are dismissed. Tenn.Code Ann. § 40–32–101(a)(1). The purpose of the expunction statute is to prevent a person from bearing the stigma of having been charged with a criminal offense when the charges have been dismissed, when the prosecution has been abandoned, or when the person has been acquitted of the charge.

*State v. Doe,* 860 S.W.2d 38, 40 (Tenn.1993); *State v. Doe,* 588 S.W.2d 549, 552 (Tenn. 1979).

■ The effect of expunging the records of a criminal charge is to restore the person to the position he or she occupied prior to the arrest or charge. *State v. Sims,* 746 S.W.2d 191, 199 (Tenn.1988). Thus, persons whose records have been expunged may properly decline to reveal or acknowledge the existence of the charge.

Expunction does not affect the records of a charge subject to judicial diversion under Tenn.Code Ann. § 40–35–313 in the same way it affects the records of a charge subject to pretrial diversion. Tenn.Code Ann. § 40–35–313(b) permits expunction of the public records but also states:

> The effect of such order [of expunction] is to restore such person, in the contemplation of the law, to the status he occupied before such arrest or indictment or information. No person as to whom such order has been entered shall be held thereafter under any provision of any law to be guilty of perjury or otherwise giving a false statement by reason of his failures to recite or acknowledge such arrest, or indictment or information, or trial in response to any inquiry made of him for any purpose, except when the person who has availed himself of the privileges of expungement then assumes the role of plaintiff in a civil action based upon the same transaction or occurrence as the expunged criminal record. In that limited situation, notwithstanding any provision of this section or § 40–32–101(a)(3)–(c)(3) to the contrary, the non-public records are admissible for the following purposes:
>
> (1) A plea of guilty is admissible into evidence in the civil trial as a judicial admission; and
>
> (2) A verdict of guilty by a judge or jury is admissible into evidence in the civil trial as either a public record or is admissible to impeach the truthfulness of the plaintiff. In addition, the non-public records contained by the court, as provided in subsection (a), shall constitute the official record

---

4. See Amendment No. 2, 2 1975 House Jour. 982–83.

of conviction and are subject to the subpoena power of the courts of civil jurisdiction.

The pretrial diversion statute does not contain the same limitations on the effect of an expunction order found in the judicial diversion statute. It follows, therefore, that records expunged following the successful completion of a pretrial diversion program cannot be used as judicial admissions or to impeach a person's credibility. This result is consistent with the Tennessee Supreme Court's holding that the State could not question the defendant's character witnesses concerning their knowledge of an arrest for charges that were later dismissed and expunged. *State v. Sims,* 746 S.W.2d at 199.

A valid reason exists for distinguishing between expunged pretrial diversion records and expunged judicial diversion records. Persons participating in judicial diversion programs have been found guilty of the offense for which they were charged.[5] Accordingly, they no longer enjoy the presumption of innocence with regard to the charge. On the other hand, persons on pretrial diversion have never been found guilty. They retain their presumption of innocence because they have not been required to plead to or to stand trial on the charge.

The probate court erred by considering the expunged September 1987 memorandum of understanding over Mr. Pizzillo's objection. This is not to say that Ms. Pizzillo could not have presented other competent proof concerning Mr. Pizzillo's conduct toward his niece and daughter. Our narrow holding is that the probate court should not have permitted Ms. Pizzillo to use the September 1987 memorandum of understanding to contradict Mr. Pizzillo's denial that he had sexually abused his daughter. The probate court's failure to exclude the memorandum of understanding has frustrated the purpose of the expungement statute by creating another public record in these proceedings. The record of this proceeding and this court's opinion are not subject to the criminal court's expunction order or to the expungement statute.

### III.

Mr. Pizzillo also asserts that the probate court erred by discounting the recommendations of the court-appointed experts with regard to the visitation arrangements for his daughter. While courts are not obligated to follow the recommendations of expert witnesses, *Cocke County Bd. of Highway Comm'rs v. Newport Utils. Bd.,* 690 S.W.2d 231, 235 (Tenn.1985); *Airline Constr., Inc. v. Barr,* 807 S.W.2d 247, 270 (Tenn.Ct.App.1990), we find nothing in this record to indicate that expanding Mr. Pizzillo's supervised visitation privileges would not be in his daughter's best interests.

Child custody and visitation disputes require the courts to focus on the welfare and best interests of the child. *Lentz v. Lentz,* 717 S.W.2d 876, 877 (Tenn.1986); *Luke v. Luke,* 651 S.W.2d 219, 221 (Tenn. 1983). While the parents' respective rights and desires are secondary in these proceedings, *Doles v. Doles,* 848 S.W.2d 656, 661 (Tenn.Ct.App.1992); *Griffin v. Stone,* 834 S.W.2d 300, 302 (Tenn.Ct.App.1992), they should not be ignored. *Neely v. Neely,* 737 S.W.2d 539, 542 (Tenn.Ct.App.1987).

A child's interests are well-served by a custody and visitation arrangement that promotes the development of relationships with both the custodial and the noncustodial parent. *Rogero v. Pitt,* 759 S.W.2d 109, 112 (Tenn.1988) (relationship with both parents); *Bryan v. Bryan,* 620 S.W.2d 85, 88 (Tenn.Ct. App.1981) (relationship with a noncustodial parent); *Dillow v. Dillow,* 575 S.W.2d 289, 291 (Tenn.Ct.App.1978) (relationship with a noncustodial parent). Thus, the courts should devise custody and visitation arrangements that interfere with each parent's relationship with his or her child as little as possible. *Taylor v. Taylor,* 849 S.W.2d 319, 331 (Tenn.1993); *Rust v. Rust,* 864 S.W.2d 52, 56 (Tenn.Ct.App.1993); *Neely v. Neely,* 737 S.W.2d at 542–43.

The August 1988 divorce decree did not permanently foreclose Mr. Pizzillo's visitation

---

**5.** Either a jury has found them guilty, or a judge has accepted their guilty plea after determining that the plea is voluntary in accordance with Tenn.R.Crim.P. 11(d).

rights with his daughter. It left the matter open pending recommendations from the Luton Community Mental Health Center. In October 1991 the probate court approved a court-appointed psychologist's recommendations that Mr. Pizzillo begin limited visitations with his daughter under a psychologist's supervision. The probate court left the door open to expanded visitation "upon such conditions as recommended by the psychologist and approved by the court."

In April 1992 the psychologist supervising Mr. Pizzillo's visits with his daughter informed the court that the weekly visits should continue but that they no longer required her direct supervision as long as another adult was present. Four months later, a court-appointed child psychiatrist recommended that "Mr. Pizzillo's children would benefit from visiting with their father in an unsupervised setting as recommended by Cathryn Yarbrough, Ph.D." The psychiatrist also recommended that "[a]s Mr. Pizzillo establishes a more normal relationship with his daughter, I would recommend extending his visitation to full days and when his daughter is a teenager and she is able to understand adult sexuality and incest boundaries, I would recommend allowing her to have overnight visitation with her father."

Ms. Pizzillo, whose attitude about visitation was viewed by two mental health professionals as not being in her daughter's best interests,[6] vigorously opposed changing the visitation arrangement because of Mr. Pizzillo's continuing denials that he had abused his daughter. The probate court also found great significance in Mr. Pizzillo's denials. At one point, the court noted:

... I'm certainly no psychologist or psychiatrist, but if he is going to face his problem, he is going to have to say, "Look, I have got a problem."

I know enough about addictions. I know alcoholics have to say, "Look, I have a problem. I am powerless over that problem, and I need help with it." I would think this would be in that same nature, and certainly when you are dealing with the life of a young child, we've really got to be careful.

Later, the court reiterated:

Well, I was still under the impression that he was fessing up and this was going to be a process where—and I don't know the proper term but ... he was going to let this little girl—he was going to fess up to what he has done and this little girl was going to be able to confront and say, "You are a sorry SOB" or whatever she wanted to call him. There is some kind of therapy like that; is that not right?

Finally, after noting that it "had rather trust those men that I quail hunt with down at Holt's Corner," the probate court denied expanded visitation

[b]ecause I have a document that says that he has abused this child. He has pled guilty to child abuse, sexual child abuse.[7] And I would have to be a blooming idiot to order visitation with that staring me in the face ...

This case involves an 11–year–old girl who believes that her father sexually abused her when she was three or four years old. She has no independent recollection of the abuse but believes that it occurred because her mother has reinforced the belief for the past eight years. Despite everything, she loves her father and wants to have a relationship with him even though she believes that he does not love or value her.

---

6. The child psychiatrist had informed the probate court that "[a]ccording to Dr. Yarbrough's notes, the mother has had significant difficulty controlling her behavior even in the presence of a mental health professional. If her behavior was such during the initial investigation, then such prejudicial behavior on the part of a custodial parent would make an accurate determination of the facts of abuse impossible. One can reasonably conclude from the notes that the mother will not allow the daughter to have a positive relationship with her father even if safeguards are in place."

7. The probate court's finding that Mr. Pizzillo "pled guilty to child abuse" is legally and factually wrong. The record contains no competent proof concerning these charges since the memorandum of understanding has been expunged. Even if it were competent, any admission contained in a memorandum of understanding is not the legal equivalent of a guilty plea.

All the mental health professionals familiar with the case have concluded that the child's interests will be best served by permitting controlled but expanded visitation with her father. These visits will allow her to make her own decisions about her relationship with her father and will enable her to develop a relationship with him that is not colored by her mother's anger and resentment toward her father. The child has progressed well in the visitations to date. She has demonstrated that she is strong and self-assured and has been able to confront her father directly about the past and to express her anger. She is already dealing effectively with her father's denial that he abused her, and permitting her and her father to continue to confront these issues will be in both the child's and the father's best interests.

Mr. Pizzillo is not seeking, and the mental health professionals are not recommending, unsupervised visitation. The request at issue was simply to permit the weekly visitation between Mr. Pizzillo and his daughter to continue under the supervision of some competent adult such as his mother or his present wife. The recommendation of continued adult supervision was not based solely on the concern that Mr. Pizzillo might abuse his daughter again but on the concern that Ms. Pizzillo will inevitably level new sexual abuse charges against Mr. Pizzillo if visitations continue.

Visitation decisions should not be made to punish or reward parents. *Long v. Long,* 488 S.W.2d 729, 733 (Tenn.Ct.App. 1972). The evidence in the record provided us demonstrates that Mr. Pizzillo's continuing denials that he abused his daughter are not causing the child additional harm and that expanding the supervised visitations will be in the child's long term best interests. Accordingly, the trial court's findings that Mr. Pizzillo pled guilty to sexually abusing his daughter and that gradually expanding his visitation rights would not be in the child's best interests are not supported by a preponderance of the evidence.

### IV.

As a final matter, Mr. Pizzillo takes issue with the probate court's decision to require him to pay $6,662.87 in discretionary fees and $5,662.50 for Ms. Pizzillo's legal expenses. These decisions address themselves to the trial court's discretion. *Lock v. National Union Fire Ins. Co.,* 809 S.W.2d 483, 490 (Tenn.1991) (discretionary costs); *Sherrod v. Wix,* 849 S.W.2d 780, 785 (Tenn. Ct.App.1992) (legal expenses in custody proceedings).

The probate court initially decided that Mr. and Ms. Pizzillo should be jointly and severally liable for the first court-appointed psychologist's fees. The court later referred the issue of costs to a special master who recommended that "each party be responsible, jointly and equally, for the costs associated with this action, these costs being, court costs, discretionary costs, costs of experts, and the Plaintiff/Respondent's attorney fees as previously ordered." The probate court refused to confirm the special master's report and ordered Mr. Pizzillo to bear all these expenses.

The probate court's award of attorney's fees and costs was not just and equitable under the facts of this case. Mr. Pizzillo is not solely responsible for these protracted legal proceedings, and a large part of the fees for the court-appointed expert witnesses could have been avoided if the parties had been acting more in their child's best interests and less out of continuing hostility. The experts' services benefitted the child, and so both parents should be responsible for them. Accordingly, we concur with the probate court's initial decision and the special master's recommendation that they should be jointly and equally responsible for these expenses.

We do not, however, concur that Mr. Pizzillo should be responsible for all of Ms. Pizzillo's legal expenses. While the expenses are certainly reasonable in light of the work performed, a large portion of the litigation from and after November 1989 was brought about by Ms. Pizzillo's desire to vindicate her position. Accordingly, we have determined that Mr. Pizzillo should be required to pay Ms. Pizzillo $1,000 to help defray her legal expenses and that Ms. Pizzillo should be responsible for the remainder.

## V.

We vacate the probate court's November 17, 1992 order and remand the case for entry of judgment and further proceedings consistent with this opinion. We also tax the costs of this appeal in equal proportions to Diana Pearl Pizzillo and to Gabriel Anthony Pizzillo, Jr. and his surety for which execution, if necessary, may issue.

TODD, P.J., and CANTRELL, J., concur.