IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 8, 2004 Session

# IN RE: S. C. H.

**Appeal from the Juvenile Court for Wilson County**
**No. 02JWC-057      Robert P. Hamilton, Judge**

---

**No. M2003-01382-COA-R3-CV - Filed December 20, 2004**

---

The mother of a three year old girl asked the court to deny the girl's father any visitation with the child because she believed that the father had sexually abused the child. The trial court did not find that the evidence conclusively proved abuse, but denied the father any visitation or other contact with his daughter, stating, "I have to side with the protection of the child." Because the trial court did not make the requisite findings to support elimination of all visitation, we must vacate the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Vacated**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM B. CAIN and FRANK G. CLEMENT, JR., JJ., joined.

Pamela M. Spicer, Nashville, Tennessee, for the appellant, D. B.

Angelique P. Kane, Alan Poindexter, Stephen Van Roberts, Lebanon, Tennessee, for the appellee, E. A. J.

## OPINION

The child at the center of these proceedings, S.C.H, was born on February 18, 1999. Her father, D.B., and her mother, E.J. were both high school sophomores at the time. Mother remained in her parents' home while taking care of the baby girl. Father began paying child support, using money from a part-time job. Mother and Father continued to date off and on, with Father's contact with the child in her first year occurring primarily when Mother brought the child along.

Shortly after the child turned one year old, the parties agreed that Father could visit on alternating Sunday afternoons. Such visitation usually involved the father picking up the child at the mother's house and bringing her to his own parents' house, where he was still living. Father's mother was usually present during these times and helped him take care of S.C.H. Father and Mother were both members of the same church in Lebanon. They attended regularly, so Father had

the opportunity to see his daughter on most Sundays, even those when he was not scheduled for visitation. During this time, the romantic relationship between Mother and Father had its ups and downs, but in the fall of 2001, they planned to get married. Mother called off their wedding and later married someone else.

On April 8, 2002, Father filed a petition in the Juvenile Court of Wilson County to establish paternity of S.C.H. and to set visitation and child support. Shortly thereafter, Mother and the maternal grandmother told the father they would no longer allow him to exercise visitation.

Mother and the maternal grandmother stated they took this position because of concern that Father had sexually abused the child. This concern arose when the child's church day care director and pastor reported to them that the child had begun to engage in sexualized behavior to the extent that it raised their suspicions. This contact was made shortly after Father filed his petition. Mother stated she had previously observed the described behavior, but was not suspicious that it might indicate sexual abuse until her conversations with the day care director and pastor. Mother became concerned and took the child to a doctor, who found no evidence of abuse. She also took S.C.H. to a counselor, who referred her to a licensed psychologist. By the time Mother answered the petition, the child had been seen by the psychologist, Maureen Sanger, Ph.D.

Dr. Sanger determined that the child's behavior and comments did not conclusively prove sexual abuse, but that they were cause for "significant concern." She reported her findings to the Department of Children's Services in Wilson County ("DCS") and requested a formal investigation to determine whether S.C.H. had been sexually abused. Dr. Sanger also recommended that the child have no unsupervised contact with her father pending the outcome of the DCS investigation.

Mother answered Father's petition on July 3, 2002. She asked the court to establish paternity in accordance with the petition and to order Father to pay child support and provide health insurance. She also recounted her own and Dr. Sanger's concerns about sexual abuse and requested that Father not be granted any visitation and that he be compelled to undergo a psycho-sexual evaluation.

On July 10, 2002 the parties entered into an agreed order stipulating that Father would be recognized as S.C.H.'s biological father, but that he would have no visitation pending further orders of the court. He was also ordered to pay child support of $355 per month as well as medical insurance.

On August 7, 2002, Father filed a motion for supervised visitation. He noted that Dr. Sanger had stated that the paternal grandmother and aunt (his sister) would be suitable adults to supervise such visitation. Since his annual family reunion was coming up, he asked the court to allow S.C.H. to attend under the strict supervision of his sister and her husband, with all subsequent visitation to be supervised by his mother and/or his sister. This motion was later withdrawn.

Father subsequently underwent a psycho-social evaluation by another licensed psychologist, Ray Potts, Ed.D. The report of Dr. Potts stated that he used a number of psychological measures to

test Father and that he had reviewed the available records, which by this time included numerous depositions. His report, like Dr. Sanger's, was less than conclusive. However, he did find that, "based upon the available information from Father the probability is low that he has engaged in any sexually abusive behaviors with children." That opinion was subject to modification "if any other significant additional data becomes available."

DCS, in conjunction with the Wilson County Sheriff's Department, conducted an investigation. The investigator from Child Protective Services stated that after investigation and review, "it has been deemed that there has been no conclusive evidence discovered to show that Father is a perpetrator of sexual abuse. The case will be closed as unfounded though it is recommended that [S.C.H.] attend counseling to aid in dealing with her questionable behavior."[1]

## I. TRIAL PROCEEDINGS

Hearings on Father's petition were conducted over four full days: on November 21 and 22, 2002, on January 31, 2003, and on April 8, 2003. By our count, twenty-five different witnesses testified, some of them several times. These included the parties, their parents, other family members, numerous members of their church, including several who worked at the church daycare program S.C.H. attended, their pastor, several DCS workers, Dr. Sanger, Dr. Potts, and another psychologist, Dr. Jane Berryman.

Because of our disposition of this appeal, it is not our role to weigh the evidence and, consequently, no purpose would be served in setting out in detail the evidence presented. Nonetheless, a brief description of the evidence is warranted.

There was evidence that the child had exhibited sexualized behaviors in a number of settings, although some witnesses, such as Father's mother, testified they had not witnessed the behavior. There was testimony that the child acted fearful in the presence of her father, both at daycare and in church, but also testimony that at other times, the child was able to relate to her father in a friendly and affectionate way.

Dr. Sanger testified at the great length on the first day of the hearing. Since Dr. Sanger had spoken to many individuals as to their observations of S.C.H.'s behavior in the course of her evaluation of the child, she was asked whether Mother and the maternal grandmother, or others, appeared to be fabricating any of the information they gave her, and she responded that they did not. Dr. Sanger read from her report and answered questions about it. As her report states, "while [S.C.H.] appears to be a generally well-adjusted girl, her sexualized behavior is much more frequent than is typical for a child her age."

---

[1]The record shows that Mother and her mother were dissatisfied with the DCS investigation and urged the Department to reopen it. The re-opened investigation concluded with the same result as before.

Dr. Sanger's account of some of her sessions with S.C.H. demonstrated the difficulty of obtaining factual information from a child so very young. Although Dr. Sanger could not conclusively answer the abuse question, she recommended that S.C.H. undergo counseling rather than further evaluation. She also recommended "starting up visitation in a gradual way," with Dr. Jane Berryman or Dr. Jay Woodman supervising.

Dr. Sanger had referred S.C.H. to Dr. Berryman for counseling, which began in December, 2002, after the hearing had begun. Dr. Berryman testified on January 31, 2003, after she had seen S.C.H. for counseling five times, and on April 8, 2003, after thirteen sessions. Despite her expertise, she encountered great difficulty trying to learn what had occurred between S.C.H. and her father. Also, in several of the later sessions, the child had refused to discuss issues with her. Dr. Berryman admitted that her frustration led her on one occasion, the last session before the final court hearing, to ask the child leading questions.

During her testimony on April 8, Dr. Berryman was asked to give her opinion as to whether Father had sexually molested his daughter. Her answer was "I cannot say this with all certainty – but based on everything I have, I can find no other logical explanation for why she's so sexually traumatized." When asked about visitation, she stated that if the court were to find there was sufficient evidence that Father had sexually abused the child, visitation would be harmful. On the other hand, if the court found there was not sufficient evidence to make that conclusion, a gradual re-institution of visitation, starting with supervised visitation, would be appropriate. She finally stated, "I would err on the side of caution," but also agreed to supervise visitation if the court ordered it. Dr. Berryman also testified that, by this point in time, the event or events that had traumatized S.C.H. had faded in her memory and causing her to continue to talk about them was counterproductive.

The trial judge questioned Dr. Berryman at some length about the future consequences to S.C.H. of renewed visitation with the father if he had indeed abused her as well as the consequences of a severed father-child relationship if he had not. The psychologist responded that putting the child in a situation with a person who has abused her, after she has told people about it, would involve a risk of trauma as well as decline in her trust. She also expressed awareness that if the father had not abused his daughter, it would constitute a grave injustice to prevent him from exercising visitation.

At the conclusion of the hearing, the trial judge announced his decision from the bench. He stated that he was charged with the best interest of the child, but that after reviewing the proof he did not find "the smoking gun." He stated that "no one can really tell you what happened with that little child," but that "I have to side with the protection of the child." He accordingly ruled that the father should not have any visitation, even though, " . . . it makes me tearful to think about what I've done to the father, but I just don't have any other option." It is obvious the court took this grave decision very seriously.

The court's final order was filed on April 25, 2002. Mother was awarded permanent care, custody and control of S.C.H. Father was ordered to have no contact with the child, but to continue

to pay child support of $355 per month and to maintain medical insurance on the child. The order includes no findings as to the basis of the denial of visitation, but incorporates the oral findings made at the end of the hearing. This appeal followed.

## II. VISITATION

When determining visitation rights, the welfare and best interests of the child must be the paramount considerations. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001); *Suttles v. Suttles*, 748 S.W.2d 427, 428 (Tenn. 1983); *Hogue v. Hogue*, 147 S.W.3d 245 (Tenn. Ct. App. 2004). In general, "a child's interests are well-served by a custody and visitation arrangement that promotes the development of relationships with both the custodial and noncustodial parent." *Wilson v. Wilson*, 987 S.W.2d 555, 564 (Tenn. Ct. App. 1998); *Pizzillo v. Pizzillo*, 884 S.W.2d 749 (Tenn. Ct. App. 1994). However, the best interests of the child may require that the trial court place restrictions on, limit, or prohibit visitation. *Eldridge*, 42 S.W.3d at 89; *Hogue*, 147 S.W.3d 245; *D. v. K.*, 917 S.W.2d 682, 685 (Tenn. Ct. App. 1995). The situations where such an order is appropriate have been defined by statute and case law.

The authority of the courts to regulate the visitation rights of non-custodial parents is governed by Tenn. Code Ann. § 36-6-301, which reads in pertinent part:

> After making an award of custody, the court shall, upon request of the non-custodial parent, grant such rights of visitation as will enable the child and the non-custodial parent to maintain a parent-child relationship unless the court finds, after a hearing, that visitation is likely to endanger the child's physical or emotional health. . . . If the court finds that the non-custodial parent has physically or emotionally abused the child, the court may require that visitation be supervised or prohibited until such abuse has ceased or until there is no reasonable likelihood that such abuse will recur.

This statute shows the legislature's clear preference for reasonable visitation sufficient to maintain a parent-child relationship with the noncustodial parent. It establishes the public policy of this state. *Helson v. Cyrus*, 989 S.W.2d 704, 707 (Tenn. Ct. App. 1998). Accordingly, "the right of the noncustodial parent to reasonable visitation is clearly favored." *Suttles*, 748 S.W.2d at 429.

Under the statute, a court may limit visitation, set protective requirements such as supervision for it, or prohibit it until it is shown such visitation would be safe for the child. However, these actions are authorized only where the court finds either (1) visitation is likely to endanger the child's physical or emotional health or (2) the noncustodial parent has physically or emotionally abused the child. Similarly, our courts have held that visitation may be limited, or even prohibited, if the court finds there is clear and definite evidence that such visitation would result in harm to the child in a physical, emotional, or moral sense. *Eldridge*, 42 S.W.3d at 85; *Suttles*, 748 S.W.2d at 429; *Helson*, 989 S.W.2d at 707.

Ordinarily, "the details of custody and visitation with children are peculiarly within the broad discretion of the trial judge." *Suttles*, 748 S.W.2d at 429 (quoting *Edwards v. Edwards,* 501 S.W.2d 283 (Tenn. Ct. App. 1973)); *see also Eldridge*, 42 S.W.3d at 85. However, the exercise of that discretion must be based on proof and applicable legal principles. *Hogue*, 147 S.W.3d 245; *D. v. K.*, 917 S.W.2d at 685. A trial court acts outside its discretion if it applies an incorrect legal standard or reaches a decision against logic or reasoning the causes an injustice to a party. *Eldridge*, 42 S.W.3d at 85. Applicable legal standards require that restriction, curtailment, or elimination of visitation rights must be based on specific findings, resulting from clear and definite evidence, that one of the situations justifying such action exists.

Termination of all visitation can have the practical effect of severing the most effective means of maintaining the parent-child relationship. The trial court herein prohibited not only unsupervised visitation, but it also declined to permit supervised visitation and prohibited all contact between Father and the child. Such a prohibition, if permanent, would constitute termination of parental rights and would require procedural safeguards applicable to such proceedings, such as proof of grounds by clear and convincing evidence. *See White v. White*, No. M1999-00087-COA-R3-CV, 2000 WL 488477 (Tenn. Ct. App. April 26, 2000) (no Tenn. R. App. P. 11 application filed). Courts have generally ordered the least restrictive limitations on parent-child interactions as were possible and consistent with the child's best interests. *See Wix v. Wix*, No. M2000-00230-COA-R3-CV, 2001 WL 219700, at *11 (Tenn. Ct. App. March 7, 2001) (no Tenn. R. App. P. 11 application filed) (discussing holdings terminating or suspending visitation and using less restrictive alternatives). In *Suttles*, our Supreme Court reversed a decision to require visitation and suspended the visitation right of a father who had been convicted of assaulting his young son and who had been sentenced to thirty years in prison for that crime and others. Even in that situation, the court stated, "[o]f course, to prevent the bonds between Defendant and child from being severed completely, he is free to communicate with his child by telephone or mail or other means approved by the trial court. . . ." 748 S.W.2d at 429.

To authorize the total prohibition on parent-child contact ordered herein, the trial court was required to find, by clear and definite evidence, that Father abused S.C.H. and/or that it is likely that S.C.H. would be harmed physically, emotionally, or morally by any contact with Father: unsupervised visitation; restricted or structured visitation; visitation supervised by one of the psychologists already involved, an appropriate entity, or another responsible adult; telephone communication with Father; and receipt of letters, cards, or gifts from Father.

The trial court made none of these findings by clear and definite evidence. To the contrary, the court made clear it was struggling with the evidence and the conclusions to draw from it. The court stated at various times in its ruling:

> . . . and I think that we don't have any answers. . . . No one can tell you what happened with that little child. But it does seem that it supports that something has happened . . . It may not be true, but it's a probably position. . . . But that does seem

like maybe something has happened and it does seem like she's consistent in always putting it on her father.

More tellingly, in response to Mother's request for attorney's fees, the court stated:

> If I had good proof that this man was a sexual perpetrator and that he had done that to your daughter . . . [I would award attorney's fees]. I don't know that he did it. I have not got good proof that he did it.

The court made no findings with regard to the likelihood of harm to S.C.H. from even supervised visits or other contact, merely stating, "And in this case, I'm just going to have to come down on the no contact side. . . . I just don't believe it would be appropriate even under supervised visitation at this time."

Despite his doubts about the weight of the evidence, the trial court decided that protection of the child from even potential risk was the controlling factor in his decision. We agree that the welfare of the child is the paramount consideration. However, the court must find that that welfare is not served by visitation sufficient to maintain a parent-child relationship because the existence of abuse or likely harm to the child has been shown by clear and definite proof.

We sympathize with the trial court's dilemma and recognize its desire to make the best decision it could for the child under the circumstances. Nevertheless, because the prohibition of contact is not supported by the requisite findings, we must vacate the judgment. The trial court, having seen and heard the witnesses, is in the best position to make the factual findings as well as to make the discretionary judgments inherent in visitation decisions. *Eldridge*, 42 S.W.3d at 88. An appellate court is not to "tweak" visitation orders or to substitute its judgment for the trial court's as to the better or more reasonable arrangement. *Id.* Accordingly, this case should be remanded for appropriate findings by the trial court.

We therefore remand this case to the trial court for fresh consideration of the evidence as to the required findings considering the evidentiary standard. Because several years have elapsed since Father last had visitation with S.C.H., who is still very young, it would be appropriate for the court to receive additional evidence regarding the child's current circumstances, especially in regard to the likelihood of harm to the child from various forms of contact with Father. If the court decides that some contact is warranted, we are confident the court, with the help of the professionals and others involved with S.C.H. can fashion a re-introduction process that will adequately safeguard the child and reduce any potential emotional trauma or other adverse consequences to her.

## III. Conclusion

The judgment of the trial court is vacated. We remand this case to the Juvenile Court of Wilson for further proceedings consistent with this opinion. Costs of this appeal are taxed to the appellee, E.A.J.

                _____
                PATRICIA J. COTTRELL, JUDGE