IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 18, 2005 Session

## ESTATE OF ALFRED O. WOODEN, ET AL. v. EVELYN HUNNICUTT, ET AL.

**Appeal from the Chancery Court for Robertson County**
**No. 17399     Carol A. Catalano, Chancellor**

**No. M2004-01038-COA-R3-CV - October 11, 2005**

Testator's two children, individually and as co-administrators of testator's estate, brought a suit against alleged transferee to whom testator purportedly conveyed real property, seeking to set aside the deed evidencing such transaction on the grounds of forgery. The Chancery Court for Robertson County, Tennessee, Judge Carol A. Catalano, held that the signature of testator was forged and set aside the deed. The Court affirms the judgment of the trial court in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., J.P., M.S., and PATRICIA J. COTTRELL, J., joined.

John R. Bradley, Portland, Tennessee, for the appellant, Evelyn Hunnicutt and Volunteer State Bank.

Peter D. Heil, Nashville, Tennessee, for the appellees, Estate of Alfred Odell Wooden, Kelly D. Wooden and Stacey Stafford, as Co-Administrators of the Estate of Alfred Odell Wooden, and individually.

## OPINION

On January 19, 2003, Alfred Odell Wooden ("Testator") died testate, survived by his two children, Stacey Stafford ("Stafford") and Kelly Wooden ("Wooden"), and his mother, Evelyn Hunnicutt ("Hunnicutt"). Hunnicutt was named personal representative of the estate but allowed Stafford and Wooden to serve in her place, as co-administrators of the estate. Testator's Will gave a life estate in certain properties to Hunnicutt, while leaving the remainder of Testator's real and personal property to Stafford and Wooden. The present dispute involves the ownership of Testator's former home place located on Worsham Springs Road in Greenbrier, Tennessee.

After Testator's death, Stafford and Wooden discovered that the Robertson County Trustee's Office did not list any property in Testator's name. They instead found a July 29, 1999, Quitclaim Deed purporting to transfer the Worsham Springs residence from Testator to Hunnicutt. Appellees also found that the Worsham Springs residence was encumbered by a deed of trust securing Volunteer State Bank for a loan made to Hunnicutt. Stafford and Wooden filed a Complaint individually and as co-administrators of Testator's estate on March 21, 2003, in the Chancery Court for Robertson County, Tennessee, against Hunnicutt and Volunteer State Bank for a declaratory judgment to set aside the deed and for damages.

Stafford and Wooden claimed that the July 1999 Quitclaim Deed was fraudulent in that the document contained a forgery of Testator's signature, and thus, the deed should be set aside and the Worsham Springs residence should become part of the estate. On June 30, 2003, Hunnicutt filed an Answer denying Stafford and Wooden any entitlement to relief and asserting that the notarization on the deed created a presumption of validity and that any discrepancy in Testator's signature was a result of Testator's health problems that affected his hands and his ability to sign his name.

On March 17, 2004, the Robertson County Chancery Court entered a final Order finding that although the handwriting expert could not rule with absolute certainty that the deed was not executed by Testator, clear and convincing evidence established that the deed was a forgery. Hunnicutt filed a timely notice of appeal.

Appellant raises three issues on appeal. Hunnicutt contends that the trial court (1) improperly considered her 1997 pretrial diversion; (2) failed to acknowledge the legal presumption of validity created when the execution of the deed was acknowledged by a notary public; and, (3) erroneously found that Appellees established that the Deed was a forgery by clear, cogent, and convincing evidence. Appellees request damages, claiming that Appellant's appeal is frivolous.

Hunnicutt first asserts that the trial court erroneously considered the conduct surrounding her 1997 pretrial diversion on forgery charges, arguing that a pretrial diversion can only be used against an individual on an extremely limited basis in a subsequent criminal proceeding and is otherwise inadmissible for any purpose. Tennessee Code Annotated Section 40-15-105(a)(3) states in pertinent part,

> ...The defendant's statement of the facts relative to the charged offenses shall not be admissible as substantive evidence in any civil or criminal proceeding against the defendant who made the statement. However, evidence of the statement is admissible as impeachment evidence against the defendant who made the statement in any criminal proceeding resulting from the termination of the memorandum of understanding pursuant to subsection (d). No other confession or admission of the defendant obtained during the pendency of and relative to the charges contained in the memorandum of understanding shall be admissible in evidence for any purpose, other than cross-examination of the defendant.

Tenn.Code Ann. § 40-15-105(a)(3)

The scope of Tennessee Code Annotated Section 40-15-105(a)(3)'s restriction against the later admissibility of an accused's confession or admission against interest was discussed at length by this Court in *Pizzillo v. Pizzillo*, 884 S.W.2d 749 (Tenn.Ct.App.1994). There, appellant argued that the restriction applied to all future criminal or civil proceedings concerning the events that gave rise to the charges covered by the memorandum of understanding. *Pizzillo*, 884 S.W.2d at 753. However, appellee asserted that the restriction was limited to later criminal proceedings following the termination of the memorandum of understanding. *Pizzillo*, 884 S.W.2d at 753. This Court reasoned that,

> The language at issue on this appeal appears in the second clause of a compound sentence.
>
> The conjunctive adverb, "however", separates the two clauses, and thus the second clause is subordinate to the first. The subordinate clause functions as an adjectival modifier of the noun phrase "testimony, evidence or depositions" appearing in the first clause. The first clause provides for the future use of "specified testimony, evidence or depositions;" while the second clause creates an exception to the first clause by stating categorically that "no confession or admission against interest" shall be admissible. The restriction in the second clause must be read in conjunction with the remainder of the statute and, therefore, relates only to later criminal trials on the charge itself.
>
> Tenn.Code Ann. § 40-15-103's legislative history reinforces the statute's grammatical construction. The language at issue was added to the bill when it reached the floor of the House of Representatives on May 7, 1975. At that time, the bill's sponsor explained that the purpose of the amendment was to protect the right of a person who participates in the program if the case later goes to trial by providing that admissions cannot be used against him if he participates in the voluntary program prior to a trial. See Amendment No. 2, 2 1975 House Jour. 982-83.
>
> We find, accordingly, that Tenn.Code Ann. § 40-15-105(a)(3)'s restriction against the later use of an accused's confessions or admissions against interest applies only to criminal trials involving the same charge contained in the memorandum of understanding. It does not apply to later civil proceedings.

*Pizzillo*, 884 S.W.2d at 753-54.

In this case, Hunnicutt was asked on direct examination whether she had ever forged a deed. She replied that she had not. On cross-examination, Hunnicutt agreed that she had been indicted and placed on pretrial diversion for forging a deed involving her sister. Hunnicutt was then impeached by the fact that she had lied by stating in her pretrial diversion application that she had never been convicted of a felony, when in fact, she had felony convictions for conspiracy to engage in gambling and falsifying her tax returns. When cross-examined about her dishonesty regarding those convictions, she replied that she had "agreed to be convicted of those charges."

According to the express terms of the statute and the *Pizzillo* decision interpreting Tennessee Code Annotated Section 40-15-105(a)(3), Hunnicutt could properly be impeached with the evidence surrounding the 1997 pretrial diversion because this is a civil, not a criminal matter. In making its credibility determination, the trial court properly relied on evidence of Hunnicutt's 1997 pre-trial diversion stating,

> Has Mrs. Hunnicutt been forthright with the Court today? The Court has to consider her credibility. She is the Grantee in [the Quitclaim Deed]. She was asked had she ever forged a signature before – a Deed before – and she said she had never. She was asked was she indicted for forgery on a deed on her sister, and she said, she would not fight her sister, but whatever that allegation was regarding property, the house belonged to her, Mrs. Hunnicutt. She admits that as a result of whatever was done on a deed involving her sister and property that was in dispute between them, that she, Mrs. Hunnicutt, received pretrial diversion in 1997. And this Court can certainly consider that. And has to.

Appellant next argues that because the execution of the deed was acknowledged by a notary public, there is a legal presumption of validity. Appellant contends that the trial court disregarded this presumption and instead, erroneously focused on the execution of the deed.

A notary public's certificate means a great deal more than the "Good Housekeeping Seal of Approval." *Beazley v. Turgeon*, 772 S.W.2d 53, 59 (Tenn.Ct.App.1989). A notary's acknowledgment says to the world that the execution of the instrument was carried out according to law. *Beazley*, 772 S.W.2d at 59. And, there is a legal presumption that a notary public notarizing a deed has acted lawfully. *Manis v. Farmers Bank of Sullivan County*, 98 S.W.2d 313 (Tenn.1936). However, a notary public takes an oath of office when a commission is issued or renewed, and in order to perform as the oath requires, it is necessary for the actor to appear personally before the notary and to acknowledge that the actor executed the deed of trust. *Beazley*, 772 S.W.2d at 60. Furthermore, the presumption that a notary public has performed her duty does not prevail over contrary proof. *Manis*, 98 S.W.2d at 314.

While the acknowledgment of a notary public is the sworn action of a public officer and unchallenged is a formidable consideration (*Manis v. Farmers Bank of Sullivan County*, 98 S.W.2d 313 (Tenn.1936); *Estate of Acuff v. O'Linger*, 56 S.W.3d 527, 531-33 (Tenn.Ct.App.2001)), the evidence in the case at bar is clear and convincing that the facts stated in the acknowledgment on the deed are simply not true. As the Supreme Court has held, "This presumption in favor of the correctness of the statements made by the notary, may be rebutted by the plaintiff in error, who might show, either that the statements therein were in point of fact untrue." *Caruthers v. Harbert*, 45 Tenn. 362, 368 (Tenn.1868).

The record amply supports the trial court's finding that the notary failed to conform to the requirements of her oath and as such, the acknowledgment on the Deed had no effect and any presumption of validity was removed. The court supported its finding by specifically stating in the record,

That [the Deed] is notarized by anyone is very important. But, it's even more important in this case that the notary is Mrs. Bradley. Mrs. Bradley is not just any notary. She is the legal secretary for her son. And [the Deed] says this instrument is prepared by John R. Bradley, her son. Now, Mrs. Bradley, has no recollection of typing this document itself. She says, though, she has help all the time. But certainly she knows the significance of placing her signature on this document as having observed it signed. However, as important she knows it is, she does not remember that [Testator] was present before her when it was signed. She says because she notarized it, if he wasn't, she would have called him on the telephone. She testified she knew his voice; she had done business with him. She would have called him and asked him if he had signed this, and if he acknowledged that he had signed it to her, then she would have added her name.

[The Deed] contains the signature of the Defendant. Likewise, Mrs. Bradley testified that she did not remember any of the specific details of Mrs. Hunnicutt signing this document. She did say that when this lawsuit that's being tried today to determine whether this Quitclaim Deed is valid came up, the lawsuit came up, that she, Mrs. Bradley, was told that [Testator] was in the hospital on July 29th, 1999 when this Deed was executed and notarized by her. She also said other than having been told that [Testator] was in the hospital, after this lawsuit was brought, March 21st, 2003, she didn't know [Testator] was in the hospital on that date, July 29th, 1999.

Now, you would think that Mrs. Bradley, a legal secretary and a notary and someone who knew Mrs. Hunnicutt well, [Testator] well enough to identify his voice on the phone, might recall some detail that she took his oath over the phone because someone that she knew, particularly the son of a friend of hers, Mrs. Hunnicutt, was in the hospital. She has absolutely no recollection.

Therefore, the Court can't really find that Mrs. Bradley took the acknowledgment of Alfred Odell Wooden over the phone when he was in the hospital. She has absolutely no recollection, but for her signature being on this document.

The final issue raised by Appellant concerns the alleged failure of the trial court to find clear, cogent, and convincing proof that the July 1999 Quitclaim Deed was a forgery. It is well settled that to set aside a deed on the grounds of fraud, the proof thereof must be clear, cogent, and convincing. *Myers v. Myers*, 891 S.W.2d 216 (Tenn.Ct.App.1994); *Pugh v. Burton*, 25 Tenn.App. 614, 166 S.W.2d 624 (Tenn.Ct.App.1942); *Anderson v. Howard*, 18 Tenn.App. 169, 74 S.W.2d 387 (Tenn.Ct.App.1934).

While the mechanics of appellate review under the "clear and convincing evidence" standard remain a matter of disagreement among the members of this Court (*see Estate of Acuff*, 56 S.W.3d

at 534)(*perm.app denied* Oct 1, 2001) and *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn.Ct.App.2001) (*perm.app. denied* July 15, 2002)), such disagreement is of no consequence in the case at bar. Both *Ray* and *Estate of Acuff* recognize that the standard set forth in *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn.Ct.App.1995) defines the proper standard. That case holds:

> The "clear and convincing evidence" standard defies precise definition. *Majors v. Smith*, 776 S.W.2d 538, 540 (Tenn.Ct.App.1989). While it is more exacting than the preponderance of the evidence standard, *Santosky v. Kramer*, 455 U.S. at 766, 102 S.Ct. At 1401; *Rentenbach Eng'g Co. v. General Realty Ltd.*, 707 S.W.2d 524, 527 (Tenn.Ct.App.1985), it does not require such certainty as the beyond a reasonable doubt standard. *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn.Ct.App.1992); *State v. Groves*, 735 S.W.2d 843, 846 (Tenn.Crim.App.1987).

> Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. *See Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn.1992). It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established. *In re Estate of Armstrong*, 859 S.W.2d 323, 328 (Tenn.Ct.App.1993); *Brandon v. Wright*, 838 S.W.2d at 536; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn.Ct.App.1985).

*O'Daniel*, 905 S.W.2d at 188.

The trial court determined that clear and convincing evidence established that the July 1999 Quitclaim Deed from Testator to Hunnicutt was a forgery. The evidence clearly and convincingly supports the action of the Chancellor.

Mrs. Allen testified that she began living with Testator in October 1997, in order to clean the house and help Testator stock his vending machines. She testified that during the first part of July 1999, Testator told her that he needed to visit Hunnicutt's restaurant in order to deliver the Deed to the Worsham Springs residence. Mrs. Allen claimed that they then proceeded to the restaurant where Testator gave Hunnicutt an envelope with the signed Deed enclosed and told her to get it notarized. However, the receipt for the drafting of the Quitclaim Deed by the Bradley Law Firm was introduced into evidence and it showed that the Deed was not paid for by Hunnicutt until July 29, 1999. Furthermore, the receipt given to Hunnicutt after registering the Deed with the Register of Deed's Office was also entered into evidence and it too, was dated July 29, 1999.

It was also shown that on July 29, 1999, the day the Quitclaim Deed was dated and notarized, Testator was in NorthCrest hospital in Springfield, Tennessee, and that he had undergone two surgeries two days before. Stafford and Wooden testified that Testator did not execute any documents while in the hospital on July 29, 1999, nor did he have any telephone conversations where he could have spoken with a notary public. Stafford further testified that Hunnicutt visited Testator

in the hospital and that Hunnicutt had told her that she had fixed it so that Wooden's wife would not get anything.

There were also discrepancies in Hunnicutt's testimony at trial and in a prior deposition concerning the delivery of the Deed. The Court noted,

> In [Hunnicutt]'s deposition, she testified that the decedent was at the restaurant on the day [the Deed] was signed, July 29th, 1999. Mrs. Hunnicutt also said, at first, she did pay for the Deed to be drawn; and then she said, No, she did not pay for this Quitclaim Deed to be prepared. That that receipt that Mrs. Bradley says is the receipt for this Quitclaim Deed, Exhibit 15, is a receipt for something else that Mrs. Hunnicutt must have had the Bradley Law Firm prepared for her. But it's very coincidental that [the Deed] would be [dated] the exact same day that she's paying for it, for the receipt itself is dated July 29th. And we all recall the receipt itself is dated July 29th. And we all recall Mr. Alfred Odell Wooden was in NorthCrest Hospital in Springfield on July 29th, 1999; that the Bradley Law Firm is in Portland, Tennessee. And that there was much going on that day for Mrs. Hunnicutt to have gotten all of this done, including having registered the Quitclaim Deed with the registrar's office. All the same day.

Hunnicutt testified that she did not witness Testator sign the Quitclaim Deed and that the Deed was given to her at the restaurant already signed but curiously, undated. Hunnicutt testified that she filled in the date at the Registrar's Office. The court made the specific observation,

> ...I'm looking at [the Quitclaim Deed], I'm looking at the date filled in, 29, I'm looking at the signature of Alfred Odell Wooden, and I would sure like to ask Mr. Vastrick if those two writings were not the same? They appear to be the same. Even the same pen. Same ink. You know, I'm a pen-and-ink person. And that looks like that date was filled in when that signature was put on the Quitclaim Deed. And you compare that ink with the ink of Mary Ralph Bradley, and her figures, the 29, and her expiration dates on the commission, you compare that ink even with the ink of Mrs. Hunnicutt's, you compare that ink with again Mary Ralph Bradley's notarization of Mrs. Hunnicutt's signature, and those are – look all the more same than the day and the signature of Alfred Odell Wooden. So if Mrs. Hunnicutt put that date there, July 29th, 1999... It really doesn't look like it.

Appellant also presented testimony that Testator may have indicated to others that he intended to sign over his property to Hunnicutt. Mr. Mayes testified that he lived with Testator until 2001 and that Testator had told him that he signed his property over to his mother for insurance purposes. Mr. Bolin testified that he assumed that the Worsham Springs residence belonged to Hunnicutt because Testator told him that he thought his mother should sell the residence and quit working so hard. Mr. Denson also testified that Testator had told him that he had signed the property over to Hunnicutt. Mr. Mayes, Mr. Bolin, and Mrs. Allen all further testified that Hunnicutt would

pay for repairs to the house.  However, none of witnesses could testify as to seeing Testator sign the Deed.

There was also evidence presented surrounding the validity of Testator's signature on the Quitclaim Deed as well as Testator's ability to use his hands.  Wooden testified that around the time of the Quitclaim Deed, he was employed by his father in his father's vending machine business and his father would make the less complicated repairs on the machines without any difficulty with his hands.  Wooden and Stafford both testified that they were familiar with their father's handwriting and that the signature on the Quitclaim Deed is not the signature of their father.

Appellees also employed the use of a forensic document examiner, Mr. Vastrick, whom the court noted had quite impressive qualifications, in order to further evaluate the signature on the Quitclaim Deed.  Mr. Vastrick compared the Quitclaim Deed to other documents known to be signed by Testator and stated that he was unable to associate Testator's signature on the Quitclaim Deed to the other documents.  He also found distinctive differences between the signature on the Quitclaim Deed and the other exhibits that were confirmed to be the genuine signature of Testator.  He even found a difference in the skill level of the writer.  He could not say beyond a reasonable doubt that Testator did not sign the Quitclaim Deed, however, he did testify that there were significant differences, including the skill level used, between the verified signatures and the signature on the Quitclaim Deed and that was a very strong indicator of non-authorship.

Dr. Wallstedt, who was Testator's doctor for five years, further explained that Testator had diabetes, and peripheral neuropathy, which is when the extremities no longer have feeling.  He explained that the swelling associated with peripheral neuropathy is most typically in the lower extremities and Testator had mentioned no problems with his hand until December 8, 2000.  Dr. Wallstedt further testified that Testator's physical condition did not reach a deleterious condition until after 2000 and perhaps into 2002, long after the time the Quitclaim Deed was allegedly signed.  Even according to the physician's report, taken on July 27, 1999, prior to Testator's surgery, doctors noted no physical disabilities that would have prevented Testator from writing his name.

However, Appellant presented the testimony of Mr. Bolin, Mr. Denson, and Mrs. Allen, who all testified that Testator's hands were swollen and gnarled and for that reason, his signature was not recognizable by the forensic examiner.

Plaintiffs have the burden of establishing under a clear, cogent, and convincing evidence standard that it is highly probable that the Quitclaim Deed in issue is a forgery.  However, the trial judge observes the witnesses face to face, hears their testimony and observes their demeanor on the stand, and thus the trial judge is the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  *Bolin v. State*, 405 S.W.2d 768, 771 (Tenn.1966).  In the trial forum alone is there human atmosphere, and the totality of the evidence cannot be reproduced with a written record.  *Bolin*, 405 S.W.2d at 771.  The record revealed that Judge Catalano clearly doubted the veracity of both Mrs. Allen and Hunnicutt's testimonies, alluding to the fact that they had quite possibly perjured themselves.  We find, based on the foregoing facts

and the trial judge's determination regarding the credibility of the witnesses, that Plaintiffs sustained their burden of proof that it is "highly probable" that the Quitclaim Deed is a forgery.

The final issue raised on appeal concerns Appellees request for damages. If it appears that an appeal is frivolous or is taken solely for the reason of delay, the Court may award damages to the appellees. Tennessee Code Annotated Section 27-1-122. An appeal is frivolous if it lacks merit or has no reasonable chance of success. *Bursack v. Wilson*, 982 S.W.2d 341, 345 (Tenn.Ct.App.1998). The Court does not find that this is an appropriate case to award damages. The judgment of the trial court is affirmed in all respects. Costs of appeal are assessed against Appellant, Evelyn Hunnicutt.

_____

WILLIAM B. CAIN, JUDGE