IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 1, 2017

IN RE EMMETT D.

Appeal from the Juvenile Court for Maury County
No. 11-JV-333      George L. Lovell, Judge

_____

No. M2016-01372-COA-R3-JV

_____

This appeal involves competing petitions to modify a residential parenting schedule in a permanent parenting plan. The child's mother sought changes to the day-to-day schedule, a modification of the existing child support order, and to be named sole decision-maker. The child's father sought additional parenting time. Following a trial, the juvenile court modified the residential schedule, granting the father more parenting time. The court also ordered the father to pay his portion of the child's preschool tuition, but the court denied the mother's requests for sole decision-making authority and for attorney's fees. Upon review of the record and the juvenile court's findings concerning the father, we conclude that the court erred in adopting the modified residential schedule. We, therefore, vacate and remand for further proceedings on this issue. We affirm in all other respects.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in
Part; Vacated in Part, and Remanded

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and ARNOLD B. GOLDIN, JJ., joined.

Neil Campbell and William P. Holloway, Franklin, Tennessee, for the appellant, Lydia D.

No brief filed on behalf of the appellee, Christopher W.

## OPINION

## I.

In September 2011, after establishing paternity, the Juvenile Court for Maury County, Tennessee, entered a permanent parenting plan for Emmett, the one-year old son of Lydia D. ("Mother") and Christopher W. ("Father"). The plan named Mother the primary residential parent and granted her 235 days of parenting time per year. Father received 130 days per year. Pertinent to this appeal, the plan also provided for joint decision-making on major decisions involving Emmett.

The permanent parenting plan remained largely unchanged until 2014.[1] In the first month of that year, the court entered an agreed order providing that Emmett "shall begin attending daycare at [a private preschool] as a full-time student beginning January 15, 2014." The agreed order also provided that the cost of the private preschool would be shared by the parties.

Later, after the child began attending the private preschool, Mother filed a petition to modify the permanent parenting plan and to modify the existing child support order. The petition alleged that Father frequently failed to exercise his allotted parenting time and habitually either dropped the child off late for preschool or picked him up early. The petition also alleged that Father failed to comply with court orders regarding child support and that there was a significant variance between what Father was paying in child support and the Tennessee Child Support Guidelines. The petition requested a modification of the parenting plan and child support.

Under Mother's proposed modified parenting plan, Father would exercise parenting time every-other weekend. Including the schedule for holidays and other school free days, under Mother's proposal, Father's parenting time would be reduced to a total of 100 days per year.[2]

In response, Father filed a counter-petition to modify the parenting plan. Father's counter-petition sought additional parenting time. The counter-petition alleged, among other things, that a modification was justified due to Emmett becoming older, his attendance at preschool conflicting with Father's time, and Mother's alleged efforts to

---

[1] On June 1, 2012, the court entered an agreed order amending the parenting plan to correct two "clerical errors." The court added language regarding a child support arrearage owed by Father and the number of days of residential time granted each parent.

[2] Mother offered a modified proposal at trial, which, if adopted by the court, would have granted Father 105 days of parenting time per year.

alienate father and son. Father's proposed modified parenting plan would grant the parties equal parenting time, with Mother remaining the primary residential parent.

A.

The court held a trial on the competing petitions on December 15, 2015. Only Father and Mother testified, with Father being called as Mother's first witness. At first, the questions to Father focused on the allegations in Mother's petition. Father admitted that he had missed a significant amount of the parenting time available to him since the entry of the permanent parenting plan. Specifically, he failed to exercise his two weeks of uninterrupted parenting time in the summers for each of the four years the plan had been in place. He further admitted to missing several additional days each year and, on other occasions, requesting that Mother pick the child up early on his days with the child. According to Father, he failed to exercise his allotted parenting time due to his work schedule.

Concerning his payment of child support, Father claimed that he always paid but admitted that he rarely, if ever, paid on time. He testified, "I pay it when I have it," or whenever he was ready to do so. This regularly occurred after all of his other bills were paid. Father admitted to staying at least a month behind on his child support payments, despite evidence that he had sufficient funds to pay. Father also stated that, in the past, he had bought his pets—an iguana and a cat—food before meeting his child support obligation. He agreed that he chose to pay late because he knew Mother's family would take care of the child.

Regarding Emmett's school, Father agreed that he and Mother had decided to enroll Emmett as a full-time preschool student in 2014 due to their understanding that he was behind in reading. Although Father also agreed to share the cost of Emmett's school, he testified that he had never helped Mother pay tuition. Additionally, despite understanding the importance of Emmett's attendance to prepare for kindergarten, Father testified that he frequently either dropped the child off late or picked him up early from school. He admitted to doing so at least 56 times in 2014. He also testified that he had picked the child up as early as 9:19 a.m. on a couple of occasions. Father explained that, after talking to Emmett's teacher, he understood that the child was not missing any important educational opportunities. Father further explained that he often picked Emmett up from school early in order to spend more time with the child.

Next, Father admitted to allowing Emmett to watch movies rated PG-13 when the child was as young as three years old. Since then, Father had witnessed the child using inappropriate language. The child had also demonstrated aggression and other behavioral issues at school.

3

As for his health, Father testified that, prior to Emmett's birth, he had voluntarily completed treatment for alcohol abuse. Even so, Father stated that he continued to drink alcohol, including during his parenting time. He reasoned that alcohol was no longer an issue for him and that he believed he had cured himself of alcoholism. He could not recall if he had consumed alcohol to the point of intoxication since the entry of the parenting plan.

Father also believed that he had cured himself of depression and anxiety, for which he had previously been diagnosed. He testified that, upon his diagnoses, counseling and medication were recommended to him. Although he attended counseling and took his medications for a time, Father no longer felt that they were necessary due to his new diet and exercise routine.

Finally, Father addressed Mother's alleged difficulties co-parenting with him. One particular incident involved a request Mother made to swap visitation days because her grandfather had died. Mother sent Father an email requesting to take Emmett with her to the memorial service on a Wednesday in Arkansas. Father responded by stating that Wednesdays were his days with the child and that Emmett would need to stay with him. Father threatened to call the police if Mother was not at the pickup location on that day. According to Father, Mother had been similarly inflexible.

Additionally, Father admitted that he, at times, made it difficult for Mother to communicate with him. He often failed to reply to communications in a timely manner, and he stated that he did not feel that a response to all of Mother's emails was warranted.

Mother testified concerning her reasoning for proposing a new residential schedule. Mother's hope was to provide more stability for Emmett in adjusting the day-to-day schedule, not to take parenting time away from Father. She explained that, under the schedule in place at the time of trial, Emmett transferred from one parent's home to the other too frequently. According to Mother, the frequent swaps were disruptive and tiring for Emmett and seemed to affect his behavior.

Mother also expressed her concerns with Father's parenting, specifically those related to the child's schooling. She testified that she and Father made the decision to enroll Emmett in preschool on a full-time basis due to their concerns that he was not adequately prepared for kindergarten. Despite their previous agreement on this issue, Father continuously dropped the child off late and picked him up early from school, causing Emmett to miss school activities that Mother felt were important for him to attend.

Mother further testified that, on more than one occasion, Father took Emmett to school in pajamas and without clothes to change into. She claimed that, when she picked him up in the afternoon, the child was very upset and crying because he did not have

4

clothes for the day. Consequently, Mother began packing a spare set of clothes to keep in the child's backpack.

Mother complained that Father failed to administer Emmett's medication for eczema or to even pick up the child's other medications from the pharmacy. Additionally, Mother claimed she knew Father allowed the child to watch inappropriate movies because, upon Emmett's return from Father's home, Emmett would behave aggressively and have nightmares. Mother testified that the child's nightmares and aggression along with other concerning behaviors, including the use of inappropriate language, led her to discuss with Father the possibility of seeking counseling for Emmett. However, Father refused to consent.

B.

In its order, entered June 17, 2016, the juvenile court modified the residential schedule. The court found that the child starting school and the accompanying change in the child's schedule constituted a material change in circumstance, as the parties had agreed.

Next, the court addressed each of the statutory best interest factors, finding that the majority of the applicable factors favored Mother. Specifically, the court determined that none of the factors favored Father but at least eight of the factors favored or slightly favored Mother. The court found as follows:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

The facts show clearly that Mother has performed a great majority of the parenting responsibilities, including a majority of the parenting time and almost all of the medical attention and school responsibility.

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or

any caregiver denying parenting time to either parent in violation of a court order;

If Father's past performance of parenting responsibilities is any indication of his future performance, the Court should seriously re-consider Father's ability and commitment to co-parenting the child. Father has missed an inordinate amount of time he could have spent with his son. He has also taken the child to his pre-school at whatever time he pleased, rather than when all the other children arrived, apparently without any realization how that affects a teacher's continuity in the classroom, having to stop whatever he or she is doing with the class when a child is tardy. Further, Father claims that Mother alienates the child from him by not giving him more parenting time, which is ludicrous when you add up all the parenting time he had, but failed to exercise. Father's statement that he had "a strong dislike for her" is going to help feed the tension between the parties which the child will see and understand, much to his detriment.

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

Father has shown that he has attended a co-parenting class. He should consider a refresher course.

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

This factor speaks to the **disposition** of a parent to provide care, not the **ability** to do so. Both parents work and can provide, but how willingly do they do so? Father's testimony was replete with statements that he would pay his child support when it was convenient to him, after he paid all his other bills, and after he bought food for his iguana and cat. This factor is heavily in Mother's favor.

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

Mother clearly has taken the greater responsibility.

. . . .

6

(7) The emotional needs and developmental level of the child;

The Court is concerned that Father has allowed the child to watch movies that are clearly inappropriate for his age, such as "Jurassic Park", where dinosaurs are chasing and trying to kill children. Mother testified that she had to remove the dinosaurs which the child had in his room because the movie made him wake up screaming and crying. He has also watched PG-13 movies with his Father that included cursing, fighting, and killing. Mother has noted the child's problems and has brought up the possibility for counseling for the child, but Father has not responded.

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child.

Father testified that he once had a problem with alcohol, and sought a twelve-step program, but that he cured himself and that alcohol is not a problem with him now. He also said that he has been intoxicated since then. It appears to the Court that Father either has no knowledge of the disease of alcoholism, or he refuses to acknowledge it. He testified that his father was hospitalized for liver failure, and that his Father's use of alcohol may have been one of the reasons why. There has been no proof to question Mother's fitness to parent the child.

. . . .

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

This factor is slightly in Mother's favor.

Despite these findings, the court increased Father's parenting time and essentially adopted the "day-to-day schedule" set forth in Father's proposed parenting plan. It determined that it was in the child's best interest for Father to remain involved in the child's life and to maximize Father's parenting time. Prior to the filing of the petitions, the residential "day-to-day schedule" in the parenting plan allowed Father to enjoy parenting time during the day on Mondays, overnight on Wednesdays, and overnight on alternating Saturdays. The court, however, altered the schedule to assign Father parenting time starting after school on Mondays and ending when Father dropped Emmett off for school on Thursdays, with Father still enjoying parenting time every-other Saturday. The court reasoned that "[u]pon [the child] reaching school age, Father's parenting time on Monday and Wednesday was significantly decreased."

The juvenile court next determined that the parties should continue to exercise joint decision-making. The court found that the child's need for counseling was the parties' only major disagreement and that Mother had not demonstrated that Father was acting unreasonably in the decision-making process.

Finally, the court ordered Father to pay $5,964.38, representing Father's portion of the child's preschool tuition from January 2014 to July 2015. However, the court denied Mother's request for attorney's fees.

**II.**

On appeal, Mother argues that the juvenile court abused its discretion in modifying the residential parenting schedule in the permanent parenting plan to allow Father additional time with the child. Mother also argues that the court abused its discretion by refusing to award her sole decision-making authority and by failing to award her attorney's fees. Mother additionally requests that this Court grant her costs and attorney's fees on appeal. Father did not file a brief on appeal.

As we have often noted, "[c]ustody and visitation determinations often hinge on subtle factors." *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). Consequently, we "are reluctant to second-guess a trial court's decisions" on such matters. *Id.* We review the trial court's factual findings de novo on the record, with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). We review the trial court's conclusions of law de novo with no presumption of correctness. *Armbrister*, 414 S.W.3d at 692.

A.

We begin by addressing Mother's arguments concerning modification of the parenting plan. We apply the two-step analysis in Tennessee Code Annotated § 36-6-101(a) (Supp. 2016) to requests for modification of the primary residential parent or the residential parenting schedule. *See, e.g.*, *In re T.C.D.*, 261 S.W.3d 734, 743 (Tenn. Ct. App. 2007) (primary residential parent modification); *In re C.R.D.*, No. M2005-02376-COA-R3-JV, 2007 WL 2491821, at *6 (Tenn. Ct. App. Sept. 4, 2007) (residential parenting schedule modification). Likewise, Mother's request for a change in decision-making authority falls under the umbrella of custody modification. *See Gider v. Hubbell*, No. M2016-00032-COA-R3-JV, 2017 WL 1178260, at *5 (Tenn. Ct. App. Mar. 29, 2017) (analyzing a parent's request for sole decision-making authority under the material change analysis); *Colley v. Colley*, No. M2014-02495-COA-R3-CV, 2016 WL 3633376, at *10 (Tenn. Ct. App. June 28, 2016), *appeal denied* (Nov. 17, 2016) (same).

The threshold issue is whether a material change of circumstance has occurred since the court's prior custody order. *See* Tenn. Code Ann. § 36-6-101(a)(2)(B); *Armbrister*, 414 S.W.3d at 697-98. Only after a material change of circumstance has been found must the court decide whether modification is in the child's best interest. *Armbrister*, 414 S.W.3d at 705. "The determinations of whether a material change of circumstances has occurred and where the best interests of the child lie are factual questions." *In re T.C.D.*, 261 S.W.3d at 742.

The parent seeking a modification of the permanent parenting plan has the burden of proving a material change by a preponderance of the evidence. Tenn. Code Ann. § 36-6-101(a)(2)(B). But, in the case before us, both parties stipulated that a material change had occurred, and Mother does not contest the juvenile court's finding of a material change in circumstances. Instead, she argues that the court erred in determining the child's best interest.

In determining a child's best interest, courts must consider a non-exclusive list of factors found at Tennessee Code Annotated § 36-6-106(a).[3] Tenn. Code Ann. §§ 36-6-404(b), -405(a) (2014). The best interest analysis is a "particularly fact-intensive process." *McEvoy v. Brewer*, No. M2001-02054-COA-R3-CV, 2003 WL 22794521, at *5 (Tenn. Ct. App. Nov. 25, 2003).

---

[3] In addition to the factors quoted above, the statutory factors include the following:

> (6) The love, affection, and emotional ties existing between each parent and the child;
>
> . . . .
>
> (9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;
>
>  . . . .
>
> (11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;
> (12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;
> (13) The reasonable preference of the child if twelve (12) years of age or older . . . ;
> (14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and
> (15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a) (2014).

Despite its finding that "[m]ost of the statutory factors above favor the Mother," the court increased Father's parenting time, particularly to allow Father additional parenting time on school nights. As explained above, the court cited many concerns with Father's behavior and failure to take responsibility for the child. The court also found that Father's strong dislike for Mother was detrimental to Emmett. And the court questioned Father's willingness to provide for the child due to his habit of staying at least a month behind on child support and refusal to make supporting his child a priority.

The evidence does not preponderate against these factual findings, and Mother does not contest them. Rather, Mother's concern is with the specific modifications the court made to the residential schedule. According to Mother, the juvenile court's order "focuses almost entirely on giving Father the benefit of the doubt and a chance to be a [better] father, rather than . . . the child's best interests."

Our review of this aspect of the juvenile court's decision is limited, as the adoption of a residential parenting schedule rests within the sound discretion of the trial court. As our Supreme Court has explained:

> [D]etermining the details of parenting plans is "[']peculiarly within the broad discretion of the trial judge.'" *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988) (quoting *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Id.* "An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge*, 42 S.W.3d at 88.

*Armbrister*, 414 S.W.3d at 693.

While we agree with the juvenile court's finding that it is in the child's best interest to allow Father to remain actively involved in the child's life, we conclude that, in fashioning the residential parenting schedule, the court erred in placing its focus on the interests of Father. The rights and desires of the parents should not be ignored in the process, but ultimately those rights and desires are secondary to the welfare and best

interests of the child. *Pizzillo v. Pizzillo*, 884 S.W.2d 749, 755 (Tenn. Ct. App. 1994). Therefore, we vacate the residential parenting schedule adopted by the court and remand for reconsideration of the schedule in light of the court's findings regarding the applicable statutory best interest factors.

Of particular concern is the modified plan's allotment of three school nights per week to Father. We recognize that Father's weekend work schedule is less flexible than his weekday schedule; however, the evidence demonstrated an unwillingness or inability on Father's part to manage the responsibilities that come along with the child residing with him on school nights. Mother offered essentially unrebutted evidence that Father had, at least on occasion, failed to deliver the child to daycare with proper clothing and with medications administered.[4] In addition, the proof showed that Father had either picked Emmett up early or dropped him off late on over 50 occasions in a single year.[5]

On the other hand, we find no abuse of discretion in the denial of Mother's request for sole decision-making authority. Although the evidence showed that Mother had been more involved in the child's schooling and medical care and that on occasion Father did not respond to Mother's communications, there was no evidence that the parents were unable to make decisions jointly. Both parties agreed that their only disagreement was over whether the child should attend counseling. Mother failed to demonstrate that the juvenile court abused its discretion in concluding that the parties were capable of discussing and working through their disagreements.

B.

Finally, we address Mother's requests for attorney's fees. Mother first argues that the juvenile court erred in denying her request for attorney's fees in the proceedings below. By statute, courts have discretion to award a spouse designated as the primary residential parent "reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties." Tenn. Code Ann. § 36-5-103(c) (2014). Awards of attorney's fees under this statutory provision are now "familiar and almost commonplace." *Deas v. Deas*, 774 S.W.2d 167, 170 (Tenn. 1989). Courts grant these awards to "facilitate a child's access to the courts." *Sherrod v. Wix*, 849 S.W.2d 780, 784 (Tenn. Ct. App. 1992). The amount of attorney's

---

[4] Father did claim that he did not believe he had ever sent the child to school in pajamas on a day that was not designated a "pajama day" at school.

[5] We do note that these instances occurred before the child started elementary school. However, Father admitted at trial that he agreed to enroll Emmett in preschool as a full-time student because the child had fallen behind his peers in the reading and writing curriculum. Both parents were concerned that he was not adequately prepared for kindergarten, and as both worked full-time jobs, neither had extra time to work with Emmett on these skills at home.

11

fees awarded must be reasonable, and the fees must relate to custody or support issues. *Miller v. Miller*, 336 S.W.3d 578, 586 (Tenn. Ct. App. 2010).

Mother points out that she successfully obtained a judgment requiring Father to pay child support arrears, and therefore, she contends that she is entitled to attorney's fees. But, while an award of attorney's fees under this provision is commonplace, it still remains discretionary, and we conclude that Mother has not shown an abuse of discretion. Both parties filed competing petitions to modify the permanent parenting plan and were in agreement that the residential schedule needed to be revised. Additionally, while Mother prevailed on the child support issue, we also note that Father prevailed on the issue of decision-making authority. *See Richardson v. Spanos*, 189 S.W.3d 720, 729 (Tenn. Ct. App. 2005) (holding the trial court did not abuse its discretion in requiring each partially successful party to be responsible for their own legal expenses).

Mother also requests that this Court grant her an award of attorney's fees on appeal. We also have discretion under Tennessee Code Annotated § 36-5-103(c) to award a prevailing party fees incurred on appeal. *Pippin v. Pippin*, 277 S.W.3d 398, 407 (Tenn. Ct. App. 2008); *Shofner v. Shofner*, 181 S.W.3d 703, 719 (Tenn. Ct. App. 2004). We consider the following factors in our decision to award fees: (1) the requesting party's ability to pay the accrued fees; (2) the requesting party's success in the appeal; (3) whether the requesting party sought the appeal in good faith; and (4) any other relevant equitable factors. *Hill v. Hill*, No. M2006-02753-COA-R3-CV, 2007 WL 4404097, at *6 (Tenn. Ct. App. Dec. 17, 2007). In light of these factors and our analysis above, we decline to award Mother her attorney's fees incurred on appeal.

## III.

We conclude that the juvenile court erred in its modification of the residential parenting schedule. We affirm the decision in all other respects. Pending a hearing on remand, the current parenting plan will remain in effect until such time as the court can determine a new residential parenting schedule.

_____
W. NEAL MCBRAYER, JUDGE